Kenneth Jerome **WIETER**, Petitioner,

v.

**Dr. R. O. SETTLE, Warden, United States Medical Center, Springfield, Missouri, Respondent.**

**No. 13174.**

United States District Court
W. D. Missouri, W. D.
April 13, 1961.

Kenneth Jerome Wieter, pro se.

Edward L. Scheufler, U. S. Atty., by John S. Boyer, Jr., Asst. U. S. Atty., Kansas City, Mo., for respondent.

RIDGE, Chief Judge.

Petitioner, charged before the United States Commissioner of the Southern District of California, by complaint asserting a violation of Section 35, Title 18 U.S.C.A. (a misdemeanor), has been confined in the Medical Center for Federal Prisoners, at Springfield, Missouri, for over 15 months, as a consequence of an order of the United States District Court for the Southern District of California, entered pursuant to Section 4244, Title 18 U.S.C.A.

At a hearing in this Court on petition for writ of habeas corpus, these salient facts were established:

September 28, 1959, petitioner was taken into custody by members of the Federal Bureau of Investigation, on warrant for his arrest issued on the complaint supra. On October 8, 1959, he was examined by a local psychiatrist appointed by the United States District Court for the Southern District of California, who made a report to that Court on October 16, 1959. November 2, 1959, a hearing was held in the above District Court pursuant to Section 4244, supra, at the conclusion of which that Court found petitioner to be mentally incompetent and incapable of understanding the proceedings against him or properly assisting in his own defense. As a result, petitioner was committed to the custody of the Attorney General "for hospitalization and care until such time as the defendant shall be mentally competent to stand trial or "until the pending charges against him are disposed of according to law." It was directed that he be confined in the Medical Center under that order, on January 8, 1960, by the Director of the Bureau of Prisons. He was accordingly placed in the custody of respondent on January 20, 1960.

Prior to the charge made against petitioner, as above stated, he had been sentenced in the United States District Court for the District of Washington, in February, 1957, for a similar offense (giving false information about a bomb on an airplane) and was committed to the Medical Center, in June, 1957, on transfer from the United States Penitentiary at Leavenworth, Kansas, as a certified psychotic patient under Section 4241, Title 18 U.S.C.A. He was released from the Medical Center upon maximum expiration of sentence on February 24, 1959, to the Mental Health Institute at Mount Pleasant, Iowa.

Petitioner was born and raised in Iowa. In 1945, he enlisted in the United States Army and was honorably discharged in November, 1946. He returned home where he did menial work and re-enlisted in the Army in March, 1948. Again, he was honorably discharged, in 1953. He re-enlisted and was sent to Japan. He was sent to Walter Reid Hospital in March of 1953. He says he received electric shock treatment while at that hospital. He went A.W.O.L. from that hospital, but was later apprehended and sent to Fitzsimons Army Hospital, from which he was discharged in April of 1954, with an honorable disability discharge, and a 100% service connection for schizophrenic reaction, paranoid type. After that time there was a notable increase in the petitioner's anti-social behavior. He was involved in a kidnaping charge, but was released by reason of insufficient evidence. He was charged with the rape of his brother's wife in May of 1955, for which he was committed to the State Mental Hospital, in Iowa, from which he escaped in June of 1955. Thereafter, he voluntarily entered the V.A. Hospital at Salt Lake City, Utah. He was discharged from that hospital after a short course of treatment. For the next two years he led a nomadic existence. When he was without funds he would obtain admission to a V.A. hospital and leave against medical advice shortly thereafter. In January of 1957, it appears that petitioner gave false information concerning an alleged attempt that had been made to place a destructive bomb in an airplane flying from Seattle,

Washington to Los Angeles, California. When arrested he then was acutely disturbed. He was transferred to the King County Hospital (State of Washington) where he was considered to be psychotic but not committable to a state hospital. Instead, he was thereafter committed to Leavenworth Penitentiary, in May of 1957, and subsequently transferred to the Medical Center for Federal Prisoners, at Springfield, Missouri; where he was kept on a certified psychotic status beyond his conditional release time and released on his maximum date to the Iowa State Mental Hospital, as previously mentioned. (The facts above stated are gleaned from Reports of Neuropsychiatric Examinations of petitioner, attached to show cause order entered herein.) At the time such neuropsychiatric examinations were made, on March 17, 1960 and at the time of petitioner's appearance before the Neuropsychiatric Staff of the Medical Center on April 13, 1960, and November 16, 1960, it appears from Staff Reports that petitioner was well oriented in the three spheres, of places, persons and things; without perceptible abnormalities of hallucinations or delusions; seemingly, with intelligence in the average range, although he appeared to be confused in his thought processes, with a tendency to lose emotional control when talking about his present and past offenses and his hospitalization, and retreated into autistic hyper-religious ideations; and that petitioner's judgment appeared to be severely diminished around the incidents in his life as to which he seems unable to integrate his role as a causative factor in determining his situation. The original diagnosis of petitioner made on April 17, 1960, was: "Schizophrenic reaction, paranoid type, in partial and tenuous remission, manifested by hyper-religiosity, decreased self-control, life history of social and occupational instability, excessive dependency on institutional living, excessive suspiciousness, and grandiose and persecutory ideas." The Neuropsychiatric Staff of the Medical Center, on April 13, 1960, agreed to that diagnosis.

At the Staff examination on November 16, 1960, the Staff agreed "that the prognosis for return of competency is good"; that if petitioner's "present improvement continues, he should be able to return to court at the time of his next N-P Staff Review in six months."

At the last-above-mentioned date, it should be noted that petitioner had then been in the custody of Government authorities, under arrest status, for more than any term of confinement that might have been meted out on a finding of guilt of the misdemeanor charge, for which petitioner was originally taken into custody. But for the habeas corpus proceeding commenced in this Court on February 13, 1961, petitioner would, in all probability, not have been released from such custody, under the commitment on which he was confined in the Medical Center, until sometime in May, next. Such release would have been for return to his committing Court to stand trial on the charge there made against him.

At his appearance before this Court, April 7, 1961, petitioner, prior to taking the witness stand, made a statement to this Court as to his contention of right to release from his present confinement, by way of habeas corpus. In so doing, he appeared to this Court to be orientated in all spheres. Although not then represented by counsel, because no timely request for Court-appointed counsel was made, he made manifest his desire to testify by "affirmation" as to the truth of the testimony he would give, rather than under the usual oath as a witness, because of religious beliefs. By his testimony, in chief, and under examination by this Court, he elicited knowledge of the facts that led up to his arrest. He rationalized the "false information," the premise of the charge made against him, as being premised in a misunderstanding of the person to whom it was conveyed, as between "balm" and "bomb" and that the message was so conveyed by him for the purpose of being returned to the V. A. Hospital, from which he was then on "pass" but overleave time. He was thereafter cross-examined by Govern-

ment counsel. After petitioner's testimony was completed the respondent proffered testimony of the Chief of the Psychiatric Staff of the Medical Center. It is not essential to recite that witness's testimony. It is sufficient to say, that the same was correlative to that which is contained in the several Neuropsychiatric Reports hereinabove referred to, and that said eminent psychiatrist stated his conclusion to be, that petitioner is at the present time unable to rationally understand the proceedings against him, and is unable to rationally cooperate with his counsel in his own defense; thereby confirming the conclusion of the Neuropsychiatric Staff of the Medical Center, as expressed in the Staff Examination Reports supra.

The issues raised and presented in the instant habeas corpus proceeding is a classic example of similar matters, recurrently arising and presented to this District Court by virtue of commitments of persons arrested but not convicted of any federal offense, as authorized by Sections 4244–4246, Title 18 U.S.C.A. In many such cases this Court is confronted with a conclusion of the Neuropsychiatric Staff of the Medical Center, that the petitioner, considered from psychiatric discipline, is unable to rationally understand the nature of the criminal proceedings pending against him and is unable to rationally cooperate with his counsel in defense thereto. However, when some such persons personally appear before this District Court in a habeas corpus proceeding it is evident from legal concepts that they, in all probability, are possessed of mental faculties that would sanction their right to stand trial on the charge made against them; and that this Court, in failing to recognize and so adjudicate that fact, would be on the threshold of cooperatively denying some such persons the right to a "speedy" trial as commanded by the Sixth Amendment to the Constitution of the United States. In the statement of that proposition, no intendment to disparage any conclusion of the Neuropsychiatric Staff of the Medical Center for

Federal Prisoners, at Springfield, Missouri, should be inferred or understood. The incongruity in that situation arises from a long-standing, recognizable inability to effect a complete reconciliation between the medical tests of "mental illness" that disqualifies a person under the psychiatric discipline as being unable to stand trial on the charge of law violation; and, the legal tests of criminal responsibility fashioned in ancient standards of criminal procedure which time and human experience have proved adequate in protection of individual human rights. This, because "the purposes (of the two disciplines) are different; the assumptions behind the two standards are different." Holloway v. United States, 1945, 80 U.S.App.D.C. 3, 148 F.2d 665, 667. This District Court with greater frequency is called upon to sound the equations in that topic. Seemingly, it can only be resolved by the statement of dogmatic legal, evidentiary concepts, lest the criminal procedural concept of "mental capacity" to stand trial be drawn into legal-psychiatric maelstrom, and the law applicable to that subject be put in a position of fighting its way out of a filament of legal-psychiatric lore, as appears to be the situation arising from the new concept of criminal responsibility exemplified by the so-called "Durham Rule." (Cf.) Blocker v. United States, D.C.Cir., 288 F.2d 853, decided March 3, 1961.

■ Though psychiatry discipline may term it hyperbole, nevertheless, when it is evidentially made to appear in a habeas corpus proceeding by a person under arrest status, confined pursuant to Sections 4244–4246, Title 18 U.S.C.A.: (1) that he has mental capacity to appreciate his presence in relation to time, place and things; (2) that his elementary mental processes are such that he apprehends (i. e. seizes and grasps with what mind he has) that he is in a Court of Justice, charged with a criminal offense; (3) that there is a Judge on the Bench; (4) a Prosecutor present who will try to convict him of a criminal charge; (5) that he has a law-

yer (self-employed or Court-appointed) who will undertake to defend him against that charge; (6) that he will be expected to tell his lawyer the circumstances, to the best of his mental ability, (whether colored or not by mental aberration) the facts surrounding him at the time and place where the law violation is alleged to have been committed; (7) that there is, or will be, a jury present to pass upon evidence adduced as to his guilt or innocence of such charge; and (8) he has memory sufficient to relate those things in his own personal manner:—such a person, from a consideration of legal standards, should be considered mentally competent to stand trial under criminal procedure, lawfully enacted. At that time, in criminal procedure, such a person is not in the position of being evaluated as capable, or incapable, of knowing right from wrong; or as being "mentally ill" or afflicted with "mental disease" from psychiatric standards so that he may, psychiatrically, be concluded as mentally unable to rationally understand the proceedings against him and cooperate with counsel in his own defense. Any such psychiatric conclusion, if arrived at, is not and cannot be legally binding. At most, it is merely opinion testimony, to be resolved by the legal *finder of fact*, in the same manner as is the testimony of all expert expressed conclusions. Any difference between legal and psychiatric disciplines respecting the latter proposition, arises from failure to appreciate that: "Opinion testimony is one of those practical anomalies of the law of evidence devised to help (the finder of fact) understand technical subjects on which they (would be) required to speculate or guess without some expert explanation." (Par. added.) See, Burger, Cir. J.'s limited, concurring opinion, Blocker v. United States, supra, at page 857 of 288 F.2d.

■ Petitioner in this habeas corpus proceeding, by evidence (testimony and written documents) established the above eight criteria to the reasonable satisfaction of this Court. At the conclusion of the hearing thereon, a mental judgment was made by this Court, that petitioner should be returned to his committing Court where a final determination respecting those things could be effected. This Court in a habeas corpus proceeding does not possess the power to finally determine that a person committed to the Medical Center under Sections 4244–4246, supra, is, or is not, *mentally competent* to stand trial on the criminal charges pending against him in some other United States District Court. All that this Court may do in such an action is to consider whether probable cause of mental competency to stand trial is established, which, in justice and within the Sixth Amendment concepts, compels that he be returned to his committing Court for a further determination thereof. Cf. Kitchens v. Steele, D.C.Mo.1953, 112 F.Supp. 383; Higgins v. McGrath, D.C.Mo.1951, 98 F.Supp. 670; Frye v. Settle, D.C.Mo.1958, 168 F.Supp. 7. That such power exists in a habeas corpus proceeding is made manifest when the eight above-recited legal concepts are shown to exist by competent evidence and a defendant is retained in the Medical Center against his will; which latter fact is always made manifest.

At the conclusion of the hearing held in this Court on the instant petition for writ of habeas corpus, the United States Attorney for this District, at the Court's request, made inquiry of the United States Attorney for the Southern District of California, whether further prosecution of petitioner in the latter District would be had, in light of the charge made against petitioner and the length of time he had been retained in the Medical Center. This was done to prevent useless transportation of petitioner to Los Angeles, California, if the complaint there lodged against him might be *nolle prossed*. The latter thought was engendered in the mind of this Court in light of an office memorandum from the United States Attorney's Office, Southern District of California, to the United States Attorney's Office, Western District of Missouri, reading, in part, as follows:

"When and if Mr. Wieter should be adjudged competent to assist in his defense this office will determine its course of action, but as of the present the charges in the complaint are still outstanding."

To the inquiry last made we are now informed that "The United States Attorney's Office, Los Angeles, California, advised by 'phone, that they will dismiss the complaint today (April 11, 1961) and forward us a certified copy of the order immediately." Memo. D. A's Office, W. D. Mo. At the time of preparing this memorandum, no copy of any such order has been filed with this Court.

■ Be that as it may, it appears from the facts heretofore stated that this case is a case in which further federal prosecution has probably been "irretrievably frustrated." Greenwood v. United States, 1955, 350 U.S. 366, 375, 76 S.Ct. 410, 100 L.Ed. 412. A misdemeanor, committed 19½ months ago, recognized by a complaint filed and arrest thereon the same date; with a commitment under Section 4244, supra, for a period of 18 months of that time, against the will of defendant, as made manifest by the order of commitment;[1] a situation which, in all probability, will continue, in the face of psychiatric testimony adduced by the Government that in the opinion of "The Psychiatric Staff (of the Medical Center, petitioner's) present treatment program (should) be continued for another three month period," (Spl.Prog. Rep. 4/13/60); and, the additional fact appearing that petitioner, since his confinement, has demanded trial on such charge; leads inevitably to that conclusion. The constitutional questions potential in that situation need not be here narrated. Ruling on petitioner's right to present release may be factually premised on probable failure of the Government to further pursue prosecution of petitioner on the charge for which he was arrested. However, it is not work of supererogation to call to the attention of those who are, and those who should be, interested in the latent constitutional question that might be raised as the consequence of pre-trial commitment of criminal defendants, and the lurking danger thereof to successful prosecution; for all that need be done in that regard is a reference to the scholarly monograph of Caleb Foote, "A Comment in Pre-Trial Commitment of Criminal Defendants." U. of Penna.L.Rev., Vol. 108, No. 6, April, 1960.[2]

---

1. The order of Court committing defendant under Sec. 4244, T. 18 U.S.C.A., recites, in part: "The defendant was afforded the opportunity to cross-examine the examining psychiatrist, Dr. Edwin E. McNeil." In the instant proceeding, petitioner testified that he, personally, was permitted to cross-examine that psychiatrist, although petitioner was then represented by Court-appointed counsel.

2. Said monograph reads, in part, as follows:

"The constitutional question aside (this case) points up a defect in pre-trial commitment procedure which is likely to be increasingly troublesome in the future. Just as federal jurisdiction depends upon a relationship between the commitment and the power to carry out a prosecution in the future, so in any case, state or federal, the propriety of a criminal pre-trial commitment to a special institution for the criminally insane should turn on the existence of a bona fide criminal accusation. At present neither the federal statute nor the common law makes any allowance for the defendant who, although perhaps conceded to be incompetent, has valid grounds for attacking the criminal charge on the merits.

"This question might arise in three different types of situations. The first is the instance * * * where the defendant can show that the prosecution is barred as a matter of law; another example would be an indictment which on its face discloses that the statute of limitations has run. Second are cases where the defendant alleges that he can show an intrinsic defect in the prosecution's factual case which will prevent conviction, for example, that essential evidence was obtained by an unlawful search and seizure or that the prosecution's evidence shows entrapment as a matter of law. Third, counsel for an incompetent defendant may wish to assert an affirmative defense which can be established without participation of the defendant. In a robbery prosecution based on iden-

Petitioner here has factually established a legal right to present release from the custody by respondent, because further prosecution of petitioner is no longer probable.

Respondent will, upon service of a copy of this memorandum on him, release petitioner to the custody of the United States Marshal for this District, who shall, with all due haste, proceed to carry petitioner to the location of the Iowa State Mental Hospital from which petitioner appears to be an escapee, and there release petitioner in the presence of the authority in charge of that institution, and deliver to said authority a copy of this memorandum. Respondent is requested to provide our Marshal with a copy of Neuropsychiatric Examination Report made of petitioner under date of April 13, 1960, for attachment to such copy of this memorandum, to the end that the same be called to the attention of the proper authorities of the State of Iowa Mental Hospital. Such procedure is deemed proper, notwithstanding the finding here made that petitioner, in all probability, is mentally competent to stand trial on any charge made against him in his committing Court; because it is the psychiatric opinion of the Chief of the Psychiatric Staff of the Medical Center that further psychiatric treatment for petitioner is desirable. Petitioner was on "pass" from a V.A. facility at the time of his arrest here considered. The relation of *parens patriae* toward petitioner lies with the State of Iowa. That the Federal Government may be of assistance to that State, through V.A. facilities, is a matter for consideration by Iowa authorities.

Petitioner can no longer be retained in federal criminal custody.

It is so ordered.

---

tification evidence, for example, counsel may be able to establish from employment records and the testimony of third parties that the defendant was at work in another city at the time of the crime. In all of these situations present law appears to say to the defendant: 'Wait. You can't raise this until and if you have recovered. In the meantime we'll detain you with the criminally insane, where you will have to live under the cloud of an accusation from which we will not allow you to exculpate yourself.'

"It may be answered that although this is regrettable the situation will arise so seldom as not to be worth the effort to prevent it, and that in any case the defendant will not be prejudiced, since if we stipulate that he is insane, he is going to be institutionalized anyway. As to the first objection, our law does not fail to protect a defendant from a situation deemed inimical to fair procedure merely because of the infrequency of its occurrence. Besides, we have no way of estimating how rare such cases may be, for it is only when the initiative to raise the competency issue shifts to the prosecution that cases will come to light in which counsel believes that it is in defendant's best interest to go to trial on the merits, notwithstanding his incompetency. If there is general acceptance and application of the rule implied in the federal statute and specifically enunciated by the Court of Appeals for the District of Columbia, that a defendant 'cannot be master of his own pleadings' as regards incompetency, then we can expect cases raising this issue to appear with increasing frequency.

"The degree to which incompetent defendants who allege that they will not be convicted are prejudiced by delay of the opportunity for exculpation depends both upon the effect of the delay on available evidence and upon the type of institutionalization to which the insane accused are subject compared with that provided in ordinary civil commitments. There is no need here to belabor the obvious fact that production of an affirmative defense may be seriously jeopardized by delay: memories fade, witnesses die or move away, documentary records may become unavailable. That the prosecution may be similarly prejudiced or that a defense based on speedy trial will be available are at best speculative possibilities, neither of which assures a defendant against prejudice."