**UNITED STATES of America,
Plaintiff,**

v.

**James Russell HERRINGTON,
Defendant.**

**Crim. A. No. 22719-3.**

United States District Court,
W. D. Missouri, W. D.

March 4, 1970.

Calvin K. Hamilton, U. S. Atty., Kansas City, Mo., for plaintiff.

Austin F. Shute, Kansas City, Mo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT OF CONVICTION OF DEFENDANT

BECKER, Chief Judge.

At about 11:30 a. m. on August 23, 1968, the Metropolitan National Bank, 7530 Troost Avenue, Kansas City, Missouri (a federally insured national banking association), was robbed by the defendant, James Russell Herrington, then a practicing member of the bar of Missouri and of this Court. By displaying a Luger automatic pistol (later found to be unloaded) in his belt, the defendant secured $5,935.00 in money from the custody of Mrs. Marie Johnson, a teller in the bank. Defendant put the money in a sack. The Kansas City Police Department was notified of the robbery before the defendant left the scene of the robbery. On leaving the bank with the money, defendant was quickly pursued on foot by the bank Vice President, Charles S. Staake, who later fired at him with a pistol and missed. Police Officer Paul S. Martz of the Kansas City Police Department, then having lunch in his patrol car across the street, received the call of the police radio dispatcher reporting the robbery and volunteered to answer the call. Officer Martz then saw the defendant emerge walking from the bank with a lady following and announcing that the bank had been robbed and pointing to the defendant as the robber. Officer Martz called for the defendant to stop. Then the defendant began to run, exposing the sack of money. Other police officers began to arrive in answer to the police radio alarm. Failing to reach his parked car, the defendant ran into a nearby building where he was surrounded, shot and captured when he refused to surrender. Before his capture he pointed the (empty but apparently loaded) Luger automatic pistol at the pursuing officers several times. Just before his capture when he was on an upper floor of the building, he threw the sack of money down to the ground floor where a following police officer was standing. On command, defendant refused to drop the Luger and continued to point it at his pursuers. Finally he was shot, seriously wounded and captured while disabled.

The evidence and stipulated facts further established the defendant's urgent need for $10,000.00 before noon of August 23, 1968, to make restitution of trust funds embezzled by defendant from clients whom he represented. One of the clients had threatened the defendant with exposure if the client did not receive restitution before noon on the day of the robbery.

George Stone, a Kansas City police officer and friend of the defendant, reported to the scene of defendant's capture where defendant lay wounded. He rode with the wounded defendant to the hospital in a fire department ambulance. The defendant conversed with Officer Stone in a logical and responsive manner. Officer Stone, who was astonished that the defendant was the robber rather than an injured innocent bystander, had the following conversation (in substance) with the defendant as the defendant was being taken from the scene ("Q.'s" by Officer Stone; "A.'s" by defendant):

Q. "Jim, what happened?"

A. "I got snowed under."

Q. "Is this the first time?"

A. "What do you think?"

Q. "Do you know you are under arrest?"

A. "Yes."

Q. "Do I have to advise you of your rights?"

A. "How many pages of it?"

Earlier in the morning of the robbery the defendant talked with off-duty Police Officer Jack Cutter at a bar and grill at 4707 Troost Avenue. Previously Officer Cutter had become acquainted with the defendant in the halls near the Municipal Courts in which defendant represented accused persons. At the bar and grill before the robbery, defendant drank whiskey and water but was not intoxicated or irrational, although he did appear to be preoccupied and complained of pain in his arm, for which he had been given an injection of cortisone the preceding day. The bartender served defendant, who was well dressed, speaking clearly and not intoxicated. The bartender noticed nothing "out of the ordinary" about defendant or his conduct.

Defendant visited John P. Regan, an acquaintance, at Regan's office, 7506 Troost Avenue, from about 11:00 a. m. to 11:15 a. m., a few minutes before the robbery. During the visit, the defendant, complaining of bursitis in his shoulder, criticized politicians, Negroes and bankers. He accused bankers of feeling superior and "looking down their noses" at other people. Defendant then told Regan that he was going to rob a bank. Regan told defendant this was stupid, asked the defendant to have a cup of coffee and tried to keep the defendant from leaving his office. The defendant brushed Regan aside saying he was going some place and would be back soon. Defendant proceeded to move his car to a position near the Metropolitan National Bank where it would be unobstructed by other cars, if used to get away after the robbery. Defendant then secured the pistol and walked into the bank. Wearing sunglasses but not masked as he confronted the teller demanding money, he shielded his face with a handkerchief held in one hand.

*The Indictment, Plea of Guilty and Original Sentence*

On August 28, 1968, a federal grand jury indicted the defendant on a charge of bank robbery with force and violence and by intimidation in violation of Section 2113(a), Title 18, United States Code. By lot the criminal action was assigned to Division No. 2 of this Court over which the Honorable William R. Collinson, United States District Judge, presides. The defendant was later arraigned, at which time he entered a plea of not guilty. On motion of defendant's counsel, Alfred O. Hardy,[1] the defendant was committed to the Veterans Administration Hospital in Kansas City, Missouri, for a mental examination as provided in Section 4244, Title 18, United States Code. The purpose of this examination was to determine the defendant's mental competence to understand the proceedings against him and to properly assist in his own defense. After examining the defendant Dr. Harry A. Stewart, M.D., a psychiatrist, reported on be-

---

1. Mr. Hardy did not appear as counsel in any of the proceedings in Division No. 3 of this Court.

half of the staff of the Veterans Administration Hospital that the defendant "is aware of the nature of the charges against him and is aware of their ramifications. He is also capable of assisting in his own defense." After receiving the report, Judge Collinson conducted an evidentiary hearing on the issue of defendant's mental competence as defined in Section 4244 and the controlling decisions on its issue, including Wieter v. Settle (W.D.Mo.) 193 F.Supp. 318. Dr. Stewart testified on the issue of mental competence. On the basis of Dr. Stewart's testimony the defendant was found mentally competent to plead to the indictment and to be tried. The case was then set for trial by jury on the charges of the indictment and the plea of not guilty, previously entered by the defendant. On January 20, 1969 (the date finally fixed for trial), the defendant withdrew his plea of not guilty and entered a plea of guilty. Among other answers to questions propounded at this time to determine the voluntariness of the plea, the following appears:

"The Court: Are you pleading guilty because you in fact are guilty of the charge that the District Attorney just read here?

"Mr. Herrington: Yes, sir."

In arriving at the findings of fact and conclusions of law this admission of guilt has not been considered as evidence against the defendant.

Neither at the time this plea of guilty was entered, nor since, has there been any contention that the defendant was mentally incompetent to understand the nature of the proceedings, to assist his counsel in his defense and to enter a voluntary plea to the charges.

Defendant's plea of guilty was accepted and a presentence investigation ordered by Judge Collinson.

On February 14, 1969, the defendant was tentatively committed to the custody of the Attorney General for the maximum period of twenty years under Section 4208(b), Title 18, U.S.C., for the study provided in subsection 4208(c). The study was conducted at the United States Medical Center for Federal Prisoners. After the time for the study was once extended at the request of the Director of the Medical Center, the report of the study with the recommendation of the Director of Bureau of Prisons for final sentencing was completed and the defendant was returned to the District Court for sentencing.

*Withdrawal of Plea of Guilty and Trial*

As a result of opinions expressed in the report by some members of the staff of the Medical Center, serious doubt was cast upon the criminal mental responsibility of the defendant at the time of the robbery; new counsel was appointed for defendant; and defendant was properly permitted by Judge Collinson to withdraw his plea of guilty and to enter a new plea of not guilty. Rule 32(d), F.R.Crim.P. Because Judge Collinson had read the presentence report on June 27, 1969, he disqualified himself and requested reassignment of the action to another division of the Court. It was thereafter reassigned to this division by lot.

The newly appointed counsel for defendant requested postponement of the trial at least to some date after September 30, 1969. In the meantime the defendant had been admitted to bail.

The defendant understandingly and intelligently waived trial by jury and stipulated, in substance, that he did in fact rob the federally insured bank at the time and in the manner charged in the indictment. By this stipulation the defendant agreed that his defense was limited to the issue of criminal mental responsibility for his acts at the time of the robbery.

The trial began on October 27, 1969. Thereafter counsel was granted time to file briefs on the complex issue of mental responsibility of defendant under the standards of federal criminal law.

## Additional Findings of Facts and Conclusions of Law

■ On the issue of proof of criminal mental responsibility, both the prosecution and the defense agree that in this case the Government has the burden of proving beyond a reasonable doubt that the defendant was mentally responsible for his acts in robbing the bank at the time of the robbery. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L. Ed. 499; Mason v. United States (C.A. 8) 402 F.2d 732. From the stipulation of facts and the evidence offered it has been concluded that this burden has been met and that the defendant, therefore, is guilty as charged.

In this case determination of the issue of criminal mental responsibility is a difficult task. The difficulties arise in great part from (1) ascertaining the applicable legal standards, (2) applying them to stipulated and proven facts, including factual inferences from other facts, and (3) weighing the opinion evidence by examining the assumed factual bases and the doctrinal reasons given in support of the opinion evidence. (Defendant's counsel invites attention to impressive attacks on the existing law of criminal responsibility, which cannot be followed to the extent that they differ from the existing law.)

Weighing the evidence in the light of the burden of proving all essential unstipulated elements of the offense beyond a reasonable doubt, resting on the Government, the following additional facts are found.

For a considerable time prior to the robbery the defendant was a desperate, frustrated man with a volatile, aggressive temper easily aroused by incidents and conditions which most people accept as inevitable unfortunate conditions of life that must be tolerated without indulgence in aggressive behavior. For example, the defendant grew increasingly abusive towards his wife and children and towards other automobile drivers in traffic. He frequently lost his temper and became belligerent in the presence of others, including some of his friends. At times he vented his frustrations by writing abusive correspondence to nationally important public figures. He was preoccupied and depressed, sometimes severely. Up to the time of the robbery, the defendant nevertheless was able to function fairly well in the practice of law in the criminal and civil courts. For example, he tried a landlord-tenant case in the Circuit Court of Jackson County in an acceptable manner three days before the robbery.

The defendant suffered from diabetes and bursitis, for which cortisone was administered the day before the robbery. Despite his illness, depression and his frustrations, there was no indication that he lacked cognition, volition and the capacity to control his behavior before, during and after the robbery.

In fact the evidence clearly shows that the defendant's depression, frustration and desperation resulted from a rational disappointment with himself, and that the robbery resulted from a rational motive to secure funds to avoid personal and professional disaster.

The defendant was trained as a Roman Catholic in a prominent substantial family. He was married and the father of nine children. He had failed to realize his ambitions to be a military aviator, to be an outstanding high income lawyer and to be a respected father, husband and imposing masculine figure. His expenditures exceeded his income, leading him to acts of embezzlement.

As his disappointments, difficulties and frustrations increased the defendant's personal behavior deteriorated. He formed an extra-marital lasting liaison with a married female client who consulted him about a separation from her husband. He had converted to his own use approximately $30,000.00 from his clients which he was unable to replace. One of the clients had discovered defendant's defalcation, had demanded cable delivery of $10,000.00 by noon the day of the robbery and had threatened to expose the defendant if the money

was not received in Honolulu before that time. In the afternoon of the day before the robbery, in an effort to raise the $10,000.00, the defendant presented a letter (signed by defendant) to a Vice President of the First National Bank, executor of the Franklin estate, requesting that the bank deliver to defendant, as attorney for the heirs, checks payable to defendant's clients for $8,962.64, the cash balance in the estate account. The Vice President consulted a lawyer for the bank who talked also to the defendant and advised that an indemnity bond be required before the checks be delivered. Arrangements were made for drafting the indemnity bond and for its execution on the following Monday. During this conference with the Vice President of the bank, the defendant was so rational and composed that the banker and his lawyer, suspecting nothing improper, made plans to comply with defendant's request on execution of the indemnity bond. The transaction was not closed because of the intervening bank robbery and arrest of the defendant. On the day before the robbery he had withdrawn $4,400.00 of trust funds, as hereinafter related.

### The Principal Evidence on The Issue of Criminal Mental Responsibility

Both the United States Attorney and the defendant's able and dedicated counsel presented factual and opinion evidence, lay and expert, on the issue of criminal mental responsibility of defendant. The lay opinion evidence in this case was indecisive and subordinate. All witnesses expressing expert opinions had access to the prior medical and mental history of defendant, including the results of psychological testing.

In the absence of expert opinion evidence the Government's case would not be established beyond a reasonable doubt. For as stated above, the burden of proving criminal mental responsibility rested upon the Government from the time the defendant placed the issue before the trial court by the production of evidence on the issue. Mason v. United States, *supra.*

Undoubtedly the defendant produced sufficient evidence to impose on the prosecution the burden of producing expert opinion evidence of criminal mental responsibility and of proving such responsibility beyond a reasonable doubt. This case was not one in which a trier of the facts could find proof of criminal mental responsibility from lay evidence alone. In this respect this case differs from Mason v. United States, *supra.*

On behalf of the defendant an imposing array of expert witnesses testified. Most of them had been members of the staff of the United States Medical Center where they had studied defendant's case while he was committed to the Medical Center under Section 4208(b), Title 18, U.S.C. The most impressive and experienced witness for the defendant was Dr. David Graham Hubbard, a psychiatrist of Dallas, Texas, consultant for the United States Public Health Service, engaged primarily in private practice. Dr. Hubbard had made special studies of bank robbers and "skyjackers" in an effort to identify common characteristics of these types of offenders. Dr. Hubbard testified, among other things, that the defendant was the victim of "involutional depression" for months before the robbery; that he couldn't stand himself and wished to destroy himself; that he couldn't commit suicide because of his religion; that at the moment of the robbery defendant was in a "fugue state", and in a state of dissociative depersonalization or reaction; that, to illustrate, at the time of the robbery defendant experienced himself as two persons, one of which possessed his conscience and knowledge of right and wrong but had no control or communication with his other person committing the robbery which had no knowledge of right and wrong, being detached or severed from his conscience; and that the defendant's moral sense walked at his side and was unavailable to him. Some of the principal factual sources of Dr. Hubbard's opinions were defendant's answers, per-

spiration, breathing and pulse rates during a vigorous interview with defendant conducted by Dr. Hubbard, before the Medical Center staff psychiatrists, for two to three hours. Dr. Hubbard conceded that his opinions were based in part upon what the defendant said of the robbery at his interview, and of the hearsay factual statements of defendant's wife, and others, none of which were subjected to a critical independent evaluation by him.

At one point Dr. Hubbard admitted that his opinion was based in part on the standards of the "Durham Rule", which is not recognized in this Circuit in its unembellished form. Pope v. United States (C.A. 8 en banc) 372 F.2d 710 at page 732.

While admissible and entitled to serious consideration, the opinion testimony of Dr. Hubbard and other defense witnesses does not, when considered with all the evidence in the record, raise a reasonable doubt of defendant's criminal mental responsibility at the time of the robbery. The testimony of these defense witnesses cannot be credited because it was based in large part on (1) inaccurate and incomplete factual assumptions and (2) upon legal concepts and standards of mental responsibility not recognized by the controlling decision of Pope v. United States, *supra,* the decisions relied on therein and those cited in the appendix to the opinion on the *Pope* case.

Careful consideration has been given to all the factual and opinion evidence submitted as favorable to the defendant in the light of the whole record of other stipulated facts and facts proven beyond a reasonable doubt. This includes the testimony of the following additional expert witnesses for the defense:

Dr. Violet Matovitch, M.D., a neurologist, employed by the Veterans Administration Hospital, Kansas City, Missouri, who testified, among other things, that she found no organic reason to explain defendant's "bizarre behavior" on the day of the robbery.

Dr. Robert Murney, a clinical psychologist in private practice and consultant to the Medical Center, to whom defendant was referred for a battery of psychological tests while under psychiatric service at the Medical Center. (See report, D. Ex. 6.)

Dr. Harry Stewart, M.D., psychiatrist and professor of the Kansas University School of Medicine, and part-time consultant to the Veterans Administration Hospital in the past. Dr. Stewart saw the defendant several times for diagnosis and treatment at the Veterans Administration Hospital during his hospitalization after the robbery and until October 1968. Dr. Stewart's opinions were based in significant part on hearsay untested descriptions of defendant's behavior by his counsel Mr. Hardy and by defendant's wife.

Dr. Donald Allen Johnston, M.D., staff psychiatrist of the Medical Center, who attended the interview conducted by Dr. Hubbard and concurred in a staff report favorable to defendant's contentions.

Dr. Frederick Miller, M.D., formerly staff psychiatrist of the Medical Center who was assigned to conduct the evaluation of the defendant for the study under Section 4208(b) ordered by Judge Collinson. Dr. Miller, who arranged for the staff interview conducted by Dr. Hubbard, concurred in the staff report favorable to defendant. Dr. Miller's principal opinions were expressed in terms that would satisfy applicable legal standards, but were based on unreliable factual assumptions. So were the other psychiatric opinions favorable to the defendant. For example, Dr. Miller relied on untested statements of fact of defendant's counsel and wife. Dr. Miller interviewed no other witnesses to the facts.

Dr. Richard Melendez, M.D., of Kansas City, resident psychiatrist, Missouri University, whom defendant consulted for treatment in 1969 before

and after his study at the Medical Center. Dr. Melendez had also served as staff psychiatrist at the Western Missouri Mental Health Center.

Minor differences and inconsistencies in diagnoses appeared in the psychiatric opinions offered by the prosecution and the defense. But total consistency is not expected or required on the complex psychiatric issues of the case at bar.

The defense also offered lay witnesses, including Judge Robert W. Berrey III of the Magistrate Court for the Fourth District of Jackson County, Missouri, Chief Clerk, Mary Lou Lemberger, and Deputy Clerk, Ruth Blauw, both of that Court. They testified concerning the defendant's unusual appearance and behavior while in the Magistrate Court offices to waive preliminary hearing in a criminal case. Judge Berrey had studied psychology, criminology and had unusual experience in these fields. He expressed the opinion that the defendant was mentally incompetent when he signed the waiver. This evidence is substantial and has been considered in arriving at the findings and conclusions in this case.

The defense also offered substantial additional lay testimony of the defendant's unusual behavior, mental condition and reactions at various times before the robbery. This evidence included the testimony of an office supply salesman, Virgil V. Bruno; a friend of the defendant for over 15 years, Kenneth W. Fry; and defendant's wife.

To sustain its burden of producing evidence of criminal mental responsibility and its burden of proving such responsibility beyond a reasonable doubt, the Government offered the stipulation of facts concerning the robbery, the embezzlement and both lay and expert opinion evidence.

The lay evidence of the Government included the testimony of William F. Rohr, investigator of the Federal Bureau of Investigation, on the location of defendant's car after the robbery.

The Government also offered the testimony of the defendant's paramour, and the following lay witnesses: Don C. Marche, a bank officer who, on the day before the bank robbery, had cashed a check for $4,400.00 on a trust account for the defendant; a lawyer, Kenneth K. Simon, Esquire, who leased office space to the defendant, and observed the defendant trying a case in police night court on August 20, 1968; the bartender, Richard G. Lamping, who served the defendant whiskey on the morning of the day of the robbery; Mrs. Marie Johnson, the bank teller who handed the bank's money to the defendant during the robbery; Vice President Charles S. Staake of the Metropolitan National Bank, mentioned above; O. Hampton Stevens, Esquire, a lawyer and an acquaintance of the defendant for many years, who was present when the defendant tried a landlord-tenant case in the Circuit Court of Jackson County on August 20, 1968; Police Officer Paul S. Martz, mentioned earlier; and Police Officer George Stone, mentioned earlier, an acquaintance of defendant who often permitted the defendant to ride with him while on motor patrol duty and who accompanied defendant in the ambulance after the capture of the defendant.

The principal expert witness for the Government was Dr. Wayne Glotfelty, Chief of the Psychiatric Staff of the Medical Center. Dr. Glotfelty observed the defendant at the Medical Center and was present at the interview of the defendant by Dr. Hubbard. In response to a hypothetical question on direct examination and under vigorous cross-examination, Dr. Glotfelty testified that the defendant at the time of the robbery was aware of the difference between right and wrong. On the principal issue Dr. Glotfelty testified that the defendant had the capacity to control his conduct. This was the critical issue because the evidence clearly showed beyond doubt that the defendant was aware of his acts and their unlawfulness. Further, by stipulation the corroborative but attacked testimony of Dr.

William B. McKnelly, Jr., M.D., a psychiatrist, was admitted. See D. Ex. 8 and on stipulation a letter report of Dr. Richard M. Childs, dated October 24, 1969, was admitted.

### Ultimate Finding of Fact

■ From all the evidence in the case, under the controlling legal standards set forth and cited in Pope v. United States (C.A. 8 en banc) 372 F.2d 710, it is found that the Government has proved beyond a reasonable doubt that the defendant was mentally responsible for his criminal acts as he planned and executed the robbery of the bank on August 23, 1968; that the defendant then possessed cognition, volition and capacity to control his behavior in the required scope and degree; that he then had the knowledge to distinguish between right and wrong; and that he deliberately formed and executed the intention to violate the law for personal gain by robbing a federally insured bank.

### Ultimate Conclusion of Law and Finding of Guilty and Conviction

On all the evidence the defendant is guilty as charged in the indictment. He is hereby convicted of the charge of the indictment.

A detailed discussion of the many cases cited in the briefs would extend this memorandum unnecessarily. Consideration has been given to all authorities cited by counsel for the defense.

### Acknowledgment of Services of Counsel

The Government was ably represented in this case by United States Attorney Calvin K. Hamilton. Mr. Hamilton's skill, fairness, intelligence and industry in representation of the United States have been recognized so long that they are expected.

The defendant was represented at the trial by Austin F. Shute, Esquire, who served as counsel appointed under the Criminal Justice Act. Mr. Shute carefully prepared the defense in depth, and has performed his duty as an advocate with zeal, sympathy for the defendant and unusual effectiveness in keeping with the highest traditions of the Bar.

Counsel for the United States is requested to submit on notice a formal judgment of conviction. Since the earlier presentence report has not been read by the undersigned, the Probation Office is requested to submit a current presentence report after additional investigation.