Ronald Watson **LAFFERTY**,
Petitioner–Appellant,

v.

Gerald **COOK**, Warden of the Utah State
Prison, Respondent–Appellee.

No. 90–4010.

United States Court of Appeals,
Tenth Circuit.

Dec. 9, 1991.

Rehearing Denied Jan. 3, 1992.

Michael D. Esplin (Gary H. Weight with him on the briefs) of Aldrich, Nelson, Weight & Esplin, Provo, Utah, for petitioner-appellant.

Sandra L. Sjogren, Asst. Atty. Gen. (R. Paul Van Dam, Atty. Gen., with her on the briefs), Salt Lake City, Utah, for respondent-appellee.

Before SEYMOUR, BRORBY and EBEL, Circuit Judges.

SEYMOUR, Circuit Judge.

Ronald Watson Lafferty was convicted in Utah state court of two capital felonies and sentenced to death. After his convictions and sentences were affirmed on direct appeal, *see State v. Lafferty*, 749 P.2d 1239 (Utah 1988), Lafferty filed a petition for habeas corpus relief in federal district court under 28 U.S.C. § 2254 (1988). During the federal proceedings, it was discovered that several transcripts of proceedings in state court had been omitted from the record on appeal. At the suggestion of the federal court, Lafferty filed a petition for rehearing with the Utah Supreme Court to enable it to consider Lafferty's claims in light of the complete record. That court determined that the additional transcripts did not warrant any change in its prior decision. *See State v. Lafferty*, 776 P.2d 631 (Utah 1989). Lafferty's federal habeas petition was then denied by the district court.

We conclude that the state trial judge applied the wrong legal standard in finding Lafferty competent to stand trial. Although we do not hold that Lafferty was incompetent as a matter of law, we do conclude that the record contains evidence from which a fact finder could have found him incompetent under the proper legal standard. We therefore grant the petition for writ of habeas corpus.

## I.

## FACTUAL BACKGROUND

Prior to the events giving rise to his convictions, Ronald Lafferty developed unorthodox religious views which resulted in his excommunication from the Church of Jesus Christ of Latter–Day Saints (the Mormon Church). His religious views also apparently played some role in his marital difficulties and his divorce. Lafferty's wife, Dianna, received encouragement in her decision to leave him from one of the murder victims, Brenda Lafferty, who was the wife of Ronald's brother Allen. Dianna also was given help during her marital crisis from Richard W. Stowe and Chloe Low. Stowe, a Stake President in The Mormon Church, drew on Church resources to give Dianna food and money after she left Lafferty. Chloe Low, the wife of a Mormon Bishop, counseled Dianna and took her in for a short time.

Lafferty's religious views were shared by his brother Dan, and to some extent by two men, Charles Alan "Chip" Carnes and Richard M. "Rick" Knapp, whom Ron and Dan Lafferty met while traveling outside Utah. These four participated in prayer meetings at which they discussed Ron Lafferty's religious revelations, one of which concerned the "removal" of Lafferty's sister-in-law Brenda, her infant daughter Erica, Richard Stowe, and Chloe Low. According to the trial testimony of Carnes and Knapp, on the day of the murders Ron and Dan Lafferty, Carnes, and Knapp drove to Brenda's home. Ron and Dan went into the house and killed Brenda and Erica by slitting their throats while Carnes and Knapp waited outside in the car. The four men then drove to the Low house, but the Lows were not there. After burglarizing the home, the men drove on to the Stowe home but missed the turn to the house. They then left Utah. The Laffer-

tys were ultimately arrested in Reno, Nevada.

The State raised the issue of Lafferty's competency to stand trial early in the proceedings. After a series of examinations, hearings, and rulings, which are detailed below, the state trial court determined that Lafferty was competent.

Prior to this ruling and during a period when the court had found Lafferty to be incompetent, Lafferty's counsel filed a notice of intent to present an insanity defense at trial. After the final competency ruling, Lafferty and his counsel attended a telephone hearing at which the court attempted to ascertain whether Lafferty still intended to present the defense. Under state law, a defendant who wishes to assert this defense must cooperate in a pretrial mental examination by two court-appointed experts. Lafferty stated that he did not intend to cooperate because he did not believe he was insane.

At a subsequent pretrial hearing, the court denied a renewed motion by Lafferty's counsel to withdraw and Lafferty's request to represent himself, because Lafferty would not personally state on the record that he wished to represent himself. However, the court informed Lafferty that he would have every reasonable opportunity to direct his counsel's strategy and presentation of the case. The court also considered Lafferty's renewed motion to assert an insanity defense. Lafferty's attorney represented to the court that Lafferty's prior refusal to cooperate, which Lafferty apparently did not recall, was based on a mistaken belief that Lafferty would still be able to present testimony at trial from experts who had already examined him during the competency proceedings. The attorney stated his intent to use that evidence, if he had control of the case, to the fullest extent possible. The court denied the motion to allow the insanity defense at trial, and reserved deciding whether evidence from the prior examinations would be admissible on the defense of manslaughter due to diminished mental capacity.

During the trial, the court ruled the expert medical evidence admissible on the lesser included offense of manslaughter. When Lafferty's counsel began to present the evidence, however, Lafferty refused to let him proceed, contrary to the attorney's forcefully expressed belief that the presentation was absolutely imperative. As a result of Lafferty's decision, his attorney was left with no option but to rest. Lafferty was convicted of capital murder and sentenced to death.

## II.

### COMPETENCY

Our review of the record in this case in light of the applicable law reveals that the state court's finding of competency is fundamentally flawed and therefore is not entitled to deference under the standard of review applicable in this habeas proceeding. When a federal court considers an application challenging a state court conviction under section 2254, the state court's determination of a factual issue "shall be presumed to be correct" unless the federal court, upon considering the relevant part of the state court record, "concludes that such factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d)(8). Because competency is a factual issue subject to the presumption of correctness set out in section 2254, *see Demosthenes v. Baal*, 495 U.S. 731, 110 S.Ct. 2223, 2225, 109 L.Ed.2d 762 (1990), our initial inquiry must be to assess whether the presumption is applicable here.[1] Thus, we must ascertain whether the com-

---

1. The presumption of correctness is not irrebuttable. If a state court determination is fairly supported by the record, and thus presumed correct, the petitioner in a federal evidentiary hearing may nonetheless prevail by shouldering the burden of establishing "by convincing evidence that the factual determination by the State court was erroneous." 28 U.S.C. § 2254(d). However, a petitioner is not required to disprove the state fact finding by convincing evidence until and unless that finding has been held entitled to the presumption of correctness. The threshold question is whether the competency determination is fairly supported by the record. *See Demosthenes v. Baal*, 495 U.S. 731, 110 S.Ct. 2223, 2225, 109 L.Ed.2d 762 (1990).

petency determination was made under a correct view of the law, and if so, whether it is fairly supported by the record, considering "that part of the record of the State court proceeding in which the determination of such factual issue was made." 28 U.S.C. § 2254(d).

## A. Standard for Determining Competency

■ Although competence is a factual issue, that term, as this case clearly demonstrates, is not self-defining. Because competency to stand trial is an aspect of substantive due process, *see Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966); *Coleman v. Saffle,* 912 F.2d 1217, 1224 (10th Cir.) (per curiam), *cert. denied,* — U.S. —, 111 S.Ct. 22, 111 L.Ed.2d 834 (1990); *Bouchillon v. Collins,* 907 F.2d 589, 592 (5th Cir.1990); *Davis v. Wyrick,* 766 F.2d 1197, 1201 (8th Cir.1985), *cert. denied,* 475 U.S. 1020, 106 S.Ct. 1209, 89 L.Ed.2d 322 (1986), the legal standard by which competency is to be evaluated is constitutionally mandated. Accordingly, the components of that standard, required as they are by the Constitution, do not vary according to the views of a particular court. The Constitution can require but one gauge against which to determine whether, because of his mental condition, a defendant's due process rights are violated by requiring him to stand trial. The content of the standard of competency is therefore a question of law which we review de novo.

■ The Supreme Court set out the legal test for competency in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam):

"[I]t is not enough for the district judge to find that 'the defendant [is] oriented to time and place and [has] some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reason-

able degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him.'"

*Id..* Although the *Dusky* standard was first articulated in the context of a federal prosecution, the Supreme Court has indicated that this standard is to be applied in federal habeas review of state proceedings as well, *see Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), and the courts have done so, *see, e.g., Coleman,* 912 F.2d at 1224 & n. 8; *Bouchillon,* 907 F.2d at 592; *Balfour v. Haws,* 892 F.2d 556, 559 (7th Cir.1989); *Davis,* 766 F.2d at 1201.

The aspect of the *Dusky* standard that is the critical focus of attention in this case is the requirement that a defendant have a *rational* as well as factual understanding of the proceedings against him. While the *Dusky* opinion itself does not set out the facts underlying its articulation of this element of the competency test, that evidence is recited in detail in the circuit opinion which the Supreme Court reversed. *See Dusky v. United States,* 271 F.2d 385, 387–89 (8th Cir.1959). The relevant record at the competency hearing there consisted of several written medical reports and the testimony of one Doctor Sturgell, "whose testimony was in substantial conformity with the reports in evidence." *Id.* at 389. That testimony, which is quoted at length below, is critical both because it illuminates the Supreme Court's intent with respect to the meaning to be given "rational understanding," and because the description of the defendant's mental state there is strikingly similar to the essentially undisputed mental condition of Lafferty.[2]

"[Doctor Sturgell] explained the statement in Doctor Moreau's report that the defendant was oriented as to time, place and person, as follows:

'This means that he is able to know the day of the week, the hour, the

---

**2.** Unlike the dissent, we do not attach significance to the fact that the defendant in *Dusky* was ultimately found competent in October 1960. The first competency hearing, which was the one the Supreme Court held to be constitutionally infirm, was held in January 1959, al-

most two years earlier, and was based on reports made prior to that. The defendant's mental condition in October 1960 simply sheds no light on the Supreme Court's holding in *Dusky* or on our inquiry here.

place in which he finds himself geographically, and the circumstances of his present situation. He knows he is in a court room; he knows the day of the week and the day of the year, and he knows that you are his attorney and Judge Smith is the judge. This is the orientation to person. He knows it all.'

Doctor Sturgell also expressed the opinion that the defendant understood what he was charged with, knew that if there was a trial it would be before a judge and jury, knew that if found guilty he could be punished, and knew who his attorney was and that it was his duty to protect the defendant's rights. It appeared from Doctor Sturgell's testimony also that the defendant had been able to furnish, with substantial accuracy, information as to his past history and as to at least some of the events leading up to the occurrence upon which the indictment was based. The Doctor expressed the opinion that the defendant would be unable properly to assist his attorney in his defense 'because I do not think that he can properly interpret the meaning of the things that have happened. I don't think he can convey full knowledge of his actual circumstances ... due to an inability to interpret reality from unreality ... to suspicions of what is going on, ... to confused thinking, which is part of his mental illness.' The Doctor also testified that the defendant 'would be able to tell his attorney of the events, as he recalls them, as interpreted by the thinking which is directly connected with his mental illness,' which could result in a false factual statement to his attorney."

*Id.*

■■■ It is beyond dispute that the Supreme Court's legal definition of competen-

cy, under which the conviction of a defendant in the above circumstances was set aside, mandates the conclusion that a defendant lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him. Thus, he must have "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402, 80 S.Ct. at 789; *see also United States v. Hemsi*, 901 F.2d 293, 296 (2d Cir.1990) (petitioner had intellectual understanding of charges against him but his impaired sense of reality substantially undermined his judgment and prevented him from cooperating rationally with his lawyer). Although the facts in each case vary, the circuits addressing competency after *Dusky*, including our own, have used a sufficient contact with reality as the touchstone for ascertaining the existence of a rational understanding. *See, e.g., Coleman*, 912 F.2d at 1227; *Hemsi*, 901 F.2d at 296; *Balfour*, 892 F.2d at 561; *Strickland v. Francis*, 738 F.2d 1542, 1551–52 (11th Cir.1984).[3]

### B. Application of the Standard

The state trial court's finding of competency in this case is fatally flawed by that court's assessment under a standard that is not only inconsistent with *Dusky*, but was specifically rejected by the legal test for competency established in that case. In addition, when the evidence adduced on this issue is viewed under the proper standard, the record indisputably does not provide the fair support required to accord the finding a presumption of correctness.[4]

The first competency assessment occurred at the trial court's direction after

---

**3.** The dissent takes issue with our citation of these cases as support for our conclusion that *Dusky* requires a sufficient contact with reality, apparently because the dissent views the cases as factually distinguishable. However, the relevant consideration is not the type of mental condition with which a particular defendant is afflicted, nor the way in which the condition manifests itself. Rather, the critical inquiry is whether the defendant's mental condition, however it may be labeled and whatever symptoms it may produce, prevents the defendant from

having a rational or factual understanding of the proceedings against him or significantly prevents the defendant from consulting with his lawyer. The cases cited are significant because each of them recognizes that this inquiry is required by *Dusky*.

**4.** By stating that the state court's determination of competency is entitled to a presumption of correctness, *see* Dissent at 1558, the dissent simply begs the pivotal question in this appeal by

the Laffertys refused appointment of counsel and indicated that they would claim the state was without jurisdiction to try them because God directed their action.[5] The competency hearing was held on October 23–24, 1984, following examination by two alienists. Both alienists concluded in their reports that Lafferty was not competent, and one of them, Dr. Phillip Washburn, testified to that opinion at the hearing. Dr. Washburn tentatively diagnosed defendant's mental illness as a paranoid delusional state. The court concluded after that hearing that Lafferty was competent.

A second hearing was held on November 28, 1984, following an evaluation and report by four expert employees of the Utah State Hospital, Van O. Austin, M.D., Robert J. Howell, Ph.D., Peter Heinbecker, M.D., and Jess Groesbeck, M.D. These examiners concluded that Lafferty was competent and the trial court agreed.[6] The next hearing took place on January 28, 1985, following a suicide attempt by Lafferty and resulting organic brain damage due to oxygen deprivation. The court found Lafferty incompetent, remanded him to the state hospital for further treatment, and scheduled another hearing in early April. This turn of events forced the state to try Dan Lafferty separately. He was convicted on all counts and received a sentence of life imprisonment when the jury could not agree to impose the death penalty.

The last competency hearing before Lafferty's trial took place on April 2, 1985. The same four examiners employed by the state submitted a report after twenty days of evaluation with respect to Lafferty's treatment and mental condition. The report concluded that Lafferty was not competent due to a paranoid delusional system that severely impaired his ability to perceive and interpret reality. Drs. Howell, Austin, and Groesbeck also testified in support and explanation of the opinions set out in their report. The gist of their testimony was that while Lafferty physically knew the nature of the proceedings against him, and their possible consequences, he was unable as a result of his paranoid delusional system to interpret them in a realistic way. In this delusional system, Lafferty believed that the examining doctors, the court system and personnel, and his own lawyer were part of a corrupt man-made order which he rejected and which he believed was actually on trial. Because of these delusional beliefs, the doctors concluded that Lafferty could not cooperate with a lawyer. They stated their belief that his mental illness had degenerated to a state of incompetency as a result of the organic brain damage arising from the suicide attempt.

The prosecution offered testimony by its own expert, Dr. Eugene Thorne, a clinical and forensic psychologist and an attorney, who expressed the opinion that Lafferty was competent to stand trial. Dr. Thorne had not examined Lafferty but instead had spent four hours reviewing documents given him by the prosecution, a review he

---

assuming the answer. The initial inquiry must be whether the Utah court made its fact findings under the correct legal standard of competency. It is elemental that fact finding made under an erroneous view of the governing law cannot be presumed correct. Only *after* concluding that a state court used the proper standard does a habeas court turn to the issue of the presumption of correctness. The dissent here has placed the factual cart before the legal horse.

5. At the arraignment, Ron Lafferty questioned the court about whether it could deal with spiritual matters. After the court told him that he was in a temporal court, not a spiritual one, Lafferty declined to enter a plea:

"MR. RON LAFFERTY: I guess I'm not [prepared to enter a plea], your honor, be-

cause of the statement that you made because of the religious overtones and spiritual overtones in this matter. You just mentioned that this court doesn't deal with that sort of thing so it seems to me that you—perhaps you don't have jurisdiction here. As a result, I'm not prepared to enter a plea because I don't want to give up my right to challenge the jurisdiction of this court, sir."
Hearing on September 21, 1984 (arraignment proceedings), at 11.

6. It should be noted that during the penalty phase of the trial, both Dr. Groesbeck and Dr. Howell testified that they had come to believe their November 1984 report finding defendant competent was incorrect.

himself described as "cursory." [7] Hearing, April 2, 1985, at 61. When asked on cross-examination what the other doctors had used in evaluating the existence of paranoia, Dr. Thorne said: "Well, they probably used mostly interview and observation." *Id.* at 67–68. He conceded that he would have had a better opportunity to evaluate the extent of Lafferty's paranoid delusional system if he had spent hours with him in consultation and observation as did the other doctors. *Id.* at 70. Dr. Thorne expressed "concerns" when given descriptions of some manifestations of Lafferty's mental condition, such as Lafferty's belief that his spirit was physically intermingling with the spirits of other people on the ward. Dr. Thorne nonetheless opined that Lafferty's belief in a judicial conspiracy that included his lawyer did not detract from Lafferty's ability to aid his defense, and that Lafferty's refusal to assist his attorney, while a product of his delusion, was a conscious choice. Dr. Thorne stated that he believed the existence of a paranoid delusional system was a straw dog, irrelevant to the issue of competency. *Id.* at 75.

On recross-examination, defense counsel asked the following questions and received the following responses from Dr. Thorne:

"Q: [I]f some one is not perceiving reality in a way that a psychologist or a psychiatrist would expect, within a wide range or what we see in society, and that could lead to the conclusion that a person was not competent to stand trial. Correct?

"A: —if I might just respond to that, and so that you understand where I'm coming from: Maybe I don't understand the issue clearly, and see if I don't. *I understand the issue to be whether he has the ability, not whether something would interfere with his ability.* And, if you would keep that distinction there, I think I could address your questions a little better. You are saying: 'Could something interfere with his ability?'

Yes, I suppose something could interfere; but the question isn't whether it could, but whether he has the ability.

"Q: *If you say in the raw sense Mr. Lafferty has the ability, are you then saying that if he has a paranoid delusional system that this court believes does actively entangle itself so that Mr. Lafferty does not perceive reality as it is, are you saying that, somehow, he still has the ability and, therefore, is competent?*

"A: *Yes. That's exactly what I'm saying.*

"Q: All right. Well, if he is mentally ill, just assume that for a moment, as Mr. Watson did,—

"A: Right.

"Q: —that he has a paranoid delusional system, and that it is interfering with his perception of reality. Okay?

"A: Yes.

"Q: Now, do you still think he's competent to stand trial?

"A: I do, as long as he meets the standards of competency. *The mental illness is irrelevant as to whether or not he meets the standards of competency, as I understand them, sir.*

"Q: Do you mean to tell me that ... [i]f a person understands that he's in a courtroom, understands Mr. Watson's there trying to convict him understands he has a court-appointed attorney, and he see's the judge there, is a person who can physically see that say: yes, I'm in the courtroom; he's competent to proceed?

"A: *The standard is not that stringent. The standard is that he is able to assist you, Mr. Johnson, in his defense, and understands the nature of the proceedings and the punishment associated with the charge, if found guilty.*"

*Id.* at 75–77 (emphasis added).

"Q: So if you can see and hear and talk, you are competent to stand trial.

---

7. In determining that the state court's conclusion of competency was fairly supported by the record, the Supreme Court in *Demosthenes*, 110 S.Ct. at 2225, emphasized that three psychiatrists who had examined the petitioner had found him competent, whereas the only evidence supporting a contrary opinion was the affidavit of a psychiatrist who had not examined the petitioner but instead had only reviewed the reports of the other psychiatrists.

"A: Well, you are partly there, you are half-way there.

"Q: Well, what's the other half?

"A: Well, the other is that he understands, that he understands what the nature of the proceedings are; that he's able to participate in those proceedings if he so chooses."

"Q: Let me stop you there. To 'understand the proceedings,' that means kind of understanding them as you and I do, but not exactly as you and I, but certainly in some range of normal. Correct?

"A: Correct. It was obvious that the defendant didn't understand the nature of the Fifth Amendment, although he did have some idea that he didn't have to testify. Go ahead.

"Q: *But if he sees this system, if he sees the trial and the claim in a totally unrealistic sense, as determined by a psychiatrist or a psychologist, that's the type of thing you are talking about that would interfere with his ability to rationally understand. Correct?*

"A: *Well, that would certainly go to an insanity defense, but it certainly wouldn't go to a competency one.*"

Id. at 80–81 (emphasis added). In Dr. Thorne's opinion, therefore, even if Lafferty had a paranoid delusional system that actively prevented him from seeing reality as it is, he was nonetheless competent.

In a written decision following this hearing, the trial court determined that Lafferty was competent. The court found Lafferty to be oriented to time and place and aware of the nature of the court proceedings. The court then stated:

"Although the defendant may be operating within a paranoid delusional system, there is no evidence except a suicide attempt, of irrational behavior within that system or within the system of his religious beliefs. In fact, his refusal to cooperate, assist counsel or admit that he is amenable to the laws of the State of Utah are all consistent with his paranoia and any delusional system pertaining to religion."

Memorandum Decision, April 8, 1985, at 7. In rejecting the examiners' finding of incompetency, the court stated its opinion that

"the examiner's [sic] conclusions are based almost entirely upon the 1960 case of *Dusky v. United States*, 360 [362] U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824] (1960) and that they have misapplied the law enunciated by that case. *Dusky* is a very short per curiam opinion with no underlying facts stated therein, and it is not possible to ascertain from the opinion the context in which the words relied upon by the examiners were used. Subsequent cases, however, have delineated what the *Dusky* standard is, which have been set forth in the State's memorandum, including *Weiter v. Settle*, [193 F.Supp. 318 (W.D.Mo.1961)], and those cases do not mandate a finding of 'incompetency to proceed' with respect to defendant Ronald W. Lafferty."

*Id.* at 10–11.[8]

The excerpts quoted above reveal unambiguously that the state trial court's evaluation of Lafferty's competency was infected by a misperception of the legal requirements set out in *Dusky*, apparently caused by the court's lack of knowledge of the underlying facts in that case. Indeed both Dr. Thorne and the court appear to have embraced the view that factual understanding alone is sufficient, a view, as discussed above, that is totally contrary to the circumstances in *Dusky* itself and that has been rejected by the cases applying the *Dusky* test.[9] This court cannot accept as consistent with *Dusky* and its progeny a finding of competency made under the view that a defendant who is unable to accurately perceive reality due to a paranoid delu-

8. Notwithstanding the state court's determination that defendant was competent to stand trial, it found that "Mr. Lafferty lacks the ability to engage in a rational decision making process regarding the acceptance of mental treatment as demonstrated by evidence of inability to weigh the costs and benefits of treatment." *Id.* at 8.

9. The *Weiter* case, which the state court quoted and upon which it primarily relied, does not cite *Dusky* or purport to interpret it. *See Wieter v. Settle*, 193 F.Supp. 318 (W.D.Ma.1961).

sional system need only act consistently with his paranoid delusion to be considered competent to stand trial.

In making its determination under an erroneous interpretation of *Dusky*, the state court in essence accepted the experts' view that Lafferty suffered from paranoid delusions which drove his decisions in these proceedings. Indeed, there does not appear to be any material dispute as to Lafferty's mental condition, in view of the testimony of Dr. Thorne that in his opinion Lafferty's paranoid delusions did not render him incompetent even if they compelled his defense decisions. When the evidence is evaluated under a proper view of *Dusky*, the record generated by the pretrial proceedings does not support a holding as a matter of law that Lafferty was competent.

■■■■ In so concluding, we recognize that a defendant's trial demeanor may in some cases constitute relevant evidence on the issue of competency. The state court's reliance in this case on its assessment of Lafferty's demeanor at trial to bolster its pretrial finding of competency, however, is unpersuasive for several reasons. First, section 2254(d) expressly states that a federal court on habeas review of a state fact finding must determine whether that finding has fair support based on "that part of the record of the State court proceeding in which the determination of such factual issue was made." 28 U.S.C. § 2254(d)(8).

The critical competency determination here occurred on April 8, 1985, prior to Lafferty's trial. It was this finding of competency that enabled Lafferty to make the crucial decision to waive an insanity defense, contrary to the forceful advice of his frustrated attorney, by refusing to cooperate in the mental examinations which are state-law prerequisites to assertion of the defense at trial. Accordingly, we are statutorily required to look only at the pretrial proceedings in evaluating whether the pretrial competency determination finds fair support in the record.[10]

Moreover, uncontradicted expert testimony indicates that the physical demeanor of a person suffering from a paranoid delusional system sheds no light on the extent to which his defense decisions are driven by a deluded perception of reality. Indeed, as was brought out by expert testimony at the first competency proceeding, "this kind of illness [is] so very difficult to recognize by just untrained people." Hearing, October 23–24, 1984, at 67. As was the case here, a defendant suffering from this illness may outwardly act logically and consistently but nonetheless be unable to make decisions on the basis of a realistic evaluation of his own best interests. *See, e.g., Bouchillon*, 907 F.2d at 593–94.

Finally, the state court's assessment of the trial demeanor evidence upon revisiting the competency issue during and after trial

10. We disagree with the dissent's statement that "[n]o meaningful distinction can be made between those cases addressing a trial court's determination of competency and those addressing a determination of entitlement to a hearing on competency." Dissent at 1560 n. 4. When, as in the instant case, a competency hearing has been held, the issue on habeas review is whether the state court's competency finding, assuming that the determination was made under the proper standard, is entitled to a presumption of correctness. However, section 2254(d)(8) directs us when doing so to consider that part of the record of the state proceeding upon which the determination was made, in this case those proceedings held prior to trial.

When, on the other hand, no state court competency hearing has been held and the defendant has proceeded to trial without such a hearing, the issue is *not* whether the state record supports a finding of competency. Rather the

inquiry on habeas is whether the state court denied the defendant his right to due process by ignoring evidence, including evidence at trial, indicating that the defendant might not be competent, and that a hearing to ascertain competency was therefore required. Evidence of a defendant's trial demeanor is of course relevant in making this assessment because the state court's duty to inquire as to competency continues through trial.

By failing to make the distinction set out above, the dissent incorrectly relies on cases such as *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); and *Coleman v. Saffle*, 912 F.2d 1217 (10th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 22, 111 L.Ed.2d 834 (1990) (per curiam), which involve the denial of a hearing, as support for its argument that we should look at trial demeanor to support a competency determination made prior to trial.

is of doubtful validity given the court's mistaken view of *Dusky*'s rational understanding requirements. In reaffirming its pretrial determination after hearing argument on Lafferty's post-trial challenge to the competency finding, the court clearly proceeded under its earlier interpretation of *Dusky*, stating that it was "convinced that the factual findings of competency to proceed were supported by substantial evidence, and there was no error with respect to either the fact or the law as to competency to proceed." Hearing, May 28, 1985, at 57–58. The state court paid lip service to *Dusky*'s requirement that competency requires a rational understanding which is different from, and more than, factual understanding. *See* Dissent at 1556–57. Nonetheless, in view of the evidence that Lafferty's illness interfered with his accurate perception of reality, the court's statements that Lafferty's understanding was rational simply renders that requirement a nullity. Indeed, as revealed by its pretrial ruling finding Lafferty competent, the trial court believed that competency merely requires no more than satisfaction "of the simple 'understand and assist' standard of the common law," Memorandum Decision, April 8, 1985, at 11.

Under the state court's view, then, a defendant suffering from paranoid delusions is to be held competent to make decisions on how best to present his mental state to a judge and jury even though that mental illness may strip him of the ability to realistically determine where his best interests lie. Indeed, a defendant operating in a paranoid delusional system may well believe that he is not mentally ill and therefore, as did Lafferty, refuse to present the defense at all. This result cannot be reconciled with the requirements of due process.[11]

■ In sum, we conclude that the state court's finding of competency cannot stand given the court's failure to proceed under a proper understanding of the due process requirements set out in *Dusky*. We further conclude that a competency determination cannot be made on this record as a matter of law. Finally, we hold that the passage of time has rendered impractical a remand for an after-the-fact hearing on competency. *See Drope*, 420 U.S. at 183, 95 S.Ct. at 909; *Pate*, 383 U.S. at 387, 86 S.Ct. at 843 (inherent difficulty of retrospectively determining competency aggravated by six year delay). Accordingly, we grant the writ, and vacate the conviction and sentence.[12] The state is of course free to retry Lafferty. Should he again raise his competency to stand trial, that assessment can then be made under the proper legal standard.

PETITION GRANTED, JUDGMENT AND CONVICTION VACATED.

BRORBY, Circuit Judge, dissenting.

Insofar as the majority characterizes Mr. Lafferty's competence to stand trial as the pivotal issue in this case, I must agree. It is a troublesome issue indeed. I must respectfully dissent, however, from the loose interpretation of governing law and the myopic review of the record necessary to

---

11. We do not perceive any relevance in the dissent's observation that tax protestors often behave in bizarre ways and may make decisions contrary to their best legal interests. *See* Dissent at 1566 n. 15. The dissent *assumes* such defendants to be competent, thus bypassing the critical inquiry in the instant case, and then asserts that because those defendants are competent, Lafferty must also be competent because he too refused to follow the advice of his counsel. Even assuming all tax protestors are competent, the fact that some people who hold wrong beliefs may nonetheless be competent proves nothing about Lafferty's condition. The issue is not whether particular beliefs are "wrong," but whether those beliefs are the product of a deluded view of reality that significantly prevents a defendant from consulting with his lawyer. To say on this record as a matter of law, as the dissent apparently wishes to do, that Lafferty could have consulted with his lawyer if he had chosen to do so is either to disregard the substantial evidence that Lafferty's mental disease rendered him unable to make that choice, or to conclude that *Dusky* does not require decisions based on reality. The first alternative is precluded by the record, and the second is precluded by the law.

12. Lafferty raises numerous other constitutional challenges to his convictions and sentences. In view of our resolution of the issue of his competency to stand trial, we need not address his remaining arguments.

support the majority's opinion vacating Mr. Lafferty's conviction.

## I. COMPETENCY STANDARD

At the threshold, we recognize that competency to stand trial is an issue of constitutional significance. *See Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). Therefore, we must first determine whether the trial court applied the appropriate test for determining competency. This determination is most certainly a question of law subject to de novo review.

The time-honored constitutional test to determine competency to stand trial is whether an accused has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a *rational* as well as *factual* understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). The record unmistakably reveals this is the test applied by the Utah trial court:

> The Court wants to also make it clear that, as to the previous finding by the Court that the defendant was not incompetent to proceed, that should in no way be construed as merely a factual finding. Under any definition of the word "rational," which the Court in *Dusky v. United States* could have intended, this Court believes, from all of the evidence, including the Court's observation on nine trial days and also on numerous other times, at numerous other times prior to that trial, believes that the defendant's:
>
> (a) Understanding of the proceedings, in his understanding of the punishment which could be imposed, that is the nature of the proceedings, the punishment that could be imposed; and his ability to

consult with his lawyer, with a reasonable degree of rational understanding, are believed and held to be rational as well as factual understandings.

Notwithstanding the trial court's full and accurate recitation of the applicable test, the majority embarks on a quest to articulate the one true legal definition of competency. Focusing in particular on the definition of "rational understanding," the majority discriminately cites cases which are factually distinct—cases leaving little doubt as to the petitioners' incompetence or the necessity of a competency hearing—to conclude the state court wrongly found Mr. Lafferty competent.

For example, the majority quotes and relies heavily upon the circuit court opinion which led to the Supreme Court's *Dusky* decision. Maj. op. at 1550. However, when characterizing this excerpt as the basis of "rational understanding" the majority fails to address the significant underlying factual differences between petitioners Dusky and Lafferty. Dusky was diagnosed as a schizophrenic suffering from "visual hallucinations, tension, insomnia, emotional turmoil, ambivalence, morbid preoccupations, depression, feelings of inadequacy and unworthiness, and a long history of alcoholism and inadequacy." *Dusky v. United States*, 271 F.2d 385, 388 (8th Cir.1959). Mr. Lafferty never exhibited this range of behaviors. The majority also fails to note that despite this long history of mental disorders, on remand Dusky was found competent, and was tried and convicted a second time. *Dusky v. United States*, 295 F.2d 743 (8th Cir.1961), *cert. denied*, 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962). Most significantly, the standard applied on remand and upheld by the Eighth Circuit as characterized by then-Judge Blackmun [1], is strikingly similar to

---

1. Dusky appealed his second conviction. The Eighth Circuit, per then-Judge Blackmun, noted the following with respect to Dusky's competency to stand trial:

> The present appeal is the culmination of that reversal and remand. The required new hearing to ascertain the defendant's competency to stand trial was held October 3, 1960.... Dr. John Kendall Dickinson, a staff

psychiatrist at the Springfield Medical Center, whose testimony at the subsequent trial is hereinafter described, and Dr. Joseph C. Sturgell, chief of the psychiatric staff there, both testified at that hearing. Their testimony and the June 1960 written report of the Center's staff were to the effect, specifically, that the defendant was then oriented as to time, place and person; that he had some recollection of

that articulated and applied by the Utah court in the present case.

The other cases cited by the majority represent unfortunate individuals who, among other things, believed they sported golden auras when they were around Buddhist monks, blew kisses to prosecutors while in the courtroom and were unable to maintain their composure, *United States v. Hemsi,* 901 F.2d 293, 294 (2d Cir.1990); or who were never able to communicate with their lawyer, assist in their defense and who thought they were being pursued by the CIA, *Strickland v. Francis,* 738 F.2d 1542, 1544 (11th Cir.1984); or who were the childhood victims of sexual abuse at the hands of a prostitute and who now suffered from Post–Traumatic Stress Disorder because of their Vietnam wartime experiences, *Bouchillon v. Collins,* 907 F.2d 589, 590 (5th Cir.1990). The majority fails to discuss the relevance of these extreme conditions to each individual competency determination or to the determination of Mr. Lafferty's competence. The majority appears to suggest that a court's assessment of a particular defendant's contact with reality may and should be divorced from an analysis of the type and manifestation of the defendant's mental condition. Maj. op. at 1551 n. 3.

Using the diagnostic nomenclature from these cases, sans their factual circumstances, to support the notion that reality is the touchstone for ascertaining the existence of a rational understanding strains legal logic. These cases do not establish as a matter of law that the Utah court employed an improper legal standard. They merely illustrate that "rational understanding" eludes any attempt at uniform definition. Nonetheless, the majority has utilized these cases as a constitutional smoke screen behind which it impermissibly substitutes, de novo, its findings as to Mr. Lafferty's rational abilities for those of the trial court.

## II. SCOPE OF REVIEW

On federal habeas review, a state court's determination on the merits of a factual issue is entitled to a *presumption* of correctness. 28 U.S.C. § 2254(d) (emphasis added);[2] *Case v. Mondragon,* 887 F.2d 1388, 1392 (10th Cir.1989) (explicit and implicit fact findings by state trial and appellate courts entitled to presumption of correctness), *cert. denied,* 494 U.S. 1035, 110 S.Ct. 1490, 108 L.Ed.2d 626 (1990); *Graham v. Wilson,* 828 F.2d 656, 658 (10th Cir.1987) (federal court must accord presumption of correctness to state court fact findings unless statutory exceptions apply), *cert. denied,* 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988). The United States Supreme Court characterizes competency to stand trial as a factual issue. *Maggio v. Fulford,* 462 U.S. 111, 117, 103 S.Ct. 2261, 2264, 76 L.Ed.2d 794 (1983). As such, the Utah court's conclusion regarding Mr. Lafferty's competency is entitled to such a presumption. *Demosthenes v. Baal,* 495 U.S. 731, ——, 110 S.Ct. 2223, 2225, 109 L.Ed.2d 762 (1990). We are therefore constrained to accord deference to the Utah

the events surrounding the offense with which he was charged; that he had present ability to consult with his lawyer with a reasonable degree of rational understanding; that he had a rational as well as a factual understanding of the proceedings in court against him; and that, generally, he was competent to stand trial. Defense counsel expressed his confidence in the psychiatrists and acknowledged to the court that he was not then experiencing the difficulty in consulting and working with his client which he had encountered at the time of the first trial. It will be noted that the evidence produced at this hearing was along the exact lines of the test set forth by the Supreme Court at page 402 of 362 U.S., at page 789 of 80 S.Ct. Judge

Ridge accordingly found that the defendant was competent to stand trial.
*Dusky v. United States,* 295 F.2d at 746.

2. Section 2254(d) reads in relevant part:
In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, *shall be presumed to be correct,* unless....
(Emphasis added.)

court's finding that Mr. Lafferty was competent to stand trial unless that finding "is not fairly supported by the record." 28 U.S.C. § 2254(d)(8).[3]

The parameters of our inquiry are well defined by plain, unambiguous statutory language. Section 2254 reads, in pertinent part:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, *or other reliable and adequate written indicia,* shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

. . . .

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, *and the Federal court on a consideration of such part of the record as a whole* concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, *considered as a whole,* does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

28 U.S.C. § 2254(d)(8) (emphasis added).

The majority has purposely excised that phrase of the habeas statute which says we examine "that part of the record of the State court proceeding in which the determination of such factual issue was made," 28 U.S.C. § 2254(d)(8), as support for its restricted review of the record. Only by ignoring Defendant's own words and behavior exhibited before, during and after the trial, and by ignoring crucial observations made by the judge and the attorneys can the majority conclude that the Utah court's competency determination is not fairly supported by the record.

This approach does not comport with the full text of the federal habeas statute. The

---

**3.** The Supreme Court has directly addressed this threshold issue:

A state court's determinations on the merits of a factual issue are entitled to a presumption of correctness on federal habeas review. A federal court may not overturn such determinations unless it concludes that they are not "fairly supported by the record." *See* 28 U.S.C. § 2254(d). We have held that a state court's conclusion regarding a defendant's competency is entitled to such a presumption. *Maggio v. Fulford,* 462 U.S. 111, 117 [103 S.Ct. 2261, 2264, 76 L.Ed.2d 794] (1983).... Accordingly, under § 2254's presumption of correctness, the state court's factual finding as to Baal's competence is binding on a federal habeas court. *See Maggio, supra; see also Marshall v. Lonberger,* 459 U.S. 422 [103 S.Ct. 843, 74 L.Ed.2d 646] (1983) (§ 2254(d)'s presumption of correctness required federal ha-

beas court to accept state court's factual findings on the issue of respondent's credibility). *Baal,* 110 S.Ct. at 2225.

We are not at liberty to adjust this analysis. Nonetheless, the majority would have us insert an additional, preliminary step into our review process. At the threshold, the majority would have us determine whether the presumption is applicable by reviewing the record to determine whether the competency finding was a proper factual finding. *See* maj. op. at 1549. This approach is circular and unsupported by authority. Furthermore, the result of this approach directly contravenes the presumption of correctness standard Congress mandated in § 2254(d). The relevant inquiry under this standard is the correctness of the competency finding, not the applicability of the presumption. To suggest otherwise is to sidestep precedent and to distort the analysis.

plain and unambiguous language of the statute requires us to consider "reliable and adequate written indicia," which necessarily includes the trial transcript. It also requires us to consider the record "as a whole."

The majority's selective examination of the record is also inconsistent with Supreme Court and Tenth Circuit precedent. In *Pate*, 383 U.S. at 386, 86 S.Ct. at 842, the Supreme Court acknowledged that a defendant's *"demeanor at trial* might be relevant to the ultimate decision as to his sanity...."* (Emphasis added.) The Court further stated that a defendant's demeanor at trial cannot be relied upon to dispense with a competency hearing. *Id.* The implication of *Robinson* is that demeanor at trial is relevant to a determination of competency.

*Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), is consistent with *Robinson.* In *Drope*, the Supreme Court explained:

The import of our decision in *Pate v. Robinson* is that evidence of a defendant's irrational behavior, *his demeanor at trial*, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

*Id.* at 180, 95 S.Ct. at 908 (emphasis added).

Likewise, this court examined the state record in *Coleman v. Saffle*, 912 F.2d 1217 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 22, 111 L.Ed.2d 834 (1990) (per cu-

riam), before it determined that the petitioner was not wrongly denied a competency hearing.[4] The significant portion of our opinion states:

Petitioner further argues that he was deprived of a constitutionally adequate determination of competency because (1) the state trial court did not *sua sponte* conduct an evidentiary hearing on petitioner's competency to stand trial, and (2) the court failed to make an independent judicial determination of petitioner's competency to stand trial. We must disagree.

The parties do not disagree concerning the underlying due process right not to be tried while incompetent, or the legal standard for determining competency to stand trial. The question presented is whether, in light of the information available to the trial court, "the [court's] failure to make further inquiry into petitioner's competence to stand trial denied him a fair trial." *Drope v. Missouri*, 420 U.S. 162, 174–75 [95 S.Ct. 896, 905, 43 L.Ed.2d 103] (1975).

. . . .

*We have carefully reviewed the record*, and conclude that there was insufficient evidence before the trial judge to mandate an evidentiary hearing on petitioner's competency to stand trial.

*Id.* at 1223–25 (footnotes omitted & emphasis added).

In addition, in *Hemsi*, 901 F.2d at 295–96, a case cited by the majority, the court wrote:

The [competency] inquiry involves an assessment of whether the accused can assist "in such ways as providing accounts of the facts, names of witnesses, etc." *United States v. Mercado*, 469 F.2d 1148, 1152 (2d Cir.1972). But it is not sufficient merely that the defendant can make a recitation of the charges or the names of witnesses, for proper assistance in the defense requires an under-

4. No meaningful distinction can be made, nor is made, in the text of § 2254(c), between the appropriate scope of review in those cases addressing a trial court's determination of competency and those addressing a determination of entitlement to a hearing on competency. The well-settled and logical requirement that we examine the whole record to determine if the state court erred is applicable in either situation.

standing that is "rational as well as factual." *Dusky v. United States,* 362 U.S. at 402 [80 S.Ct. at 789]. In making its assessment, the court may take account of a number of factors, *including the defendant's comportment in the courtroom. See, e.g., Drope v. Missouri,* 420 U.S. 162, 180 [95 S.Ct. 896, 908, 43 L.Ed.2d 103] (1975)....

*Id.* at 295 (emphasis added).

The law is clear. The Utah court's competency determination is entitled to a presumption of correctness, and upon review, support for that determination may be found in the record as a whole.

## III. SUPPORT OF RECORD

Although some of the facts in the record—including Defendant's suicide attempt, the last diagnosis of his doctors and the abbreviated record review by the Prosecution's doctor—disturb me as they do the majority, two principles regarding competency determinations are well-settled. First, "[n]ot all people who have a mental problem are rendered by it legally incompetent." *Bouchillon,* 907 F.2d at 593. And second, "[t]he court is free to disregard the testimony of expert witnesses (such as psychologists) as to the competency in favor of that of lay persons *if there is sufficient evidence to justify doing so." Id.* at 594 n. 15; *see also Maggio,* 462 U.S. at 117–18,

103 S.Ct. at 2264 (court of appeals, when reviewing a competency determination, erroneously substituted its judgment as to witness credibility for that of the state court). The majority appears to have disregarded these principles.

The evidence in this case, as revealed by the trial record and supported by the observations of the judge, attorneys and prosecution psychologist fairly supports the trial court's determination that Mr. Lafferty had a rational understanding of the legal proceedings which were affecting him. A thorough review is in order.

Mr. Lafferty's competency to stand trial became an issue almost immediately after his arrest. The matter was raised because Mr. Lafferty and his brother refused appointment of counsel, and because their behavior during arraignment hinted they would claim the State could not try them because their actions were directed by God.[5] In any event, the State filed a petition for inquiry into the Laffertys' competence, beginning a course of events that resulted in numerous examinations and reports by expert psychologists and psychiatrists, as well as discussions between the Laffertys, their attorneys and the trial judge.[6]

The two physicians who examined Defendant in October 1984 generally believed he

---

5. The following exchanges occurred between the court and Defendant Ron Lafferty:

THE COURT: ... This is a temporal court, it's structured along the lines where people deal with people's problems, and as to where truth comes down in that setting, that's the way the system is, to have the truth come out. But it's from people—from so-called witnesses and others who have some association with or knowledge of the facts that are important.

MR. RON LAFFERTY: So this court is not prepared to deal with matters pertaining to religion and that sort of thing; is that what you are saying?

THE COURT: Well—.

MR. RON LAFFERTY: Or spiritual matters?

THE COURT: Well, this is not a spiritual court. This is a temporal court.

MR. RON LAFFERTY: I needed to know that.

....

THE COURT: I'll proceed with you, Ronald Lafferty, to the information and the five

counts therefore that has just been presented. Are you prepared at this time to enter a plea? Six counts, excuse me.

MR. RON LAFFERTY: I guess I'm not, your honor, because of the statement that you made because of the religious overtones and spiritual overtones in this matter. You just mentioned that this court doesn't deal with that sort of thing so it seems to me that you—perhaps you don't have jurisdiction here. As a result, I'm not prepared to enter a plea because I don't want to give up my right to challenge the jurisdiction of this court, sir.

THE COURT: The court will then enter a plea of not guilty on your behalf.

6. Competency examinations of criminal defendants are governed by Utah Code Ann. § 77–15–1 *et seq.* (Repl.Vol.1990). The first Petition for Inquiry into Competency was filed on Sept. 27, 1984.

was incompetent.[7] One of the doctors limited his conclusion, writing only that Defendant "may not be competent to proceed with the court processes because of his mental illness." Oct. Washburn Letter. Both interviewed him and found him cooperative, although one noted he refused to take any written psychiatric tests. Oct. Washburn Letter. Dr. Groesbeck reported Defendant was well aware of being charged with murder but refused to accept appointed counsel because he felt all lawyers are corrupt. He said Defendant could very quickly and easily outline the functions of the judge, attorneys, defendant and jury, and noted he was fully oriented to time, place and person. In addition, Defendant knew he faced the death penalty and insightfully avoided discussing anything incriminating. Oct. Groesbeck Letter at 3–7. "His intellectual level appeared to [be] average or above," according to Dr. Groesbeck. *Id.* at 7.

Nevertheless, both doctors thought Defendant was incompetent due to mental illness. They wrote he suffered from "grandiosity" and was afflicted with a paranoid personality system or disorder. Oct. Groesbeck Letter at 8–9; Oct. Washburn Letter. For example, Defendant described his claim of divine revelations to Dr. Groesbeck as a "flow of intelligence in the mind" that is "sweet" and "expanding." Oct. Groesbeck Letter at 5. The doctors firmly felt he could not effectively represent himself and questioned his ability to assist any attorney appointed for him. Dr. Groesbeck wrote that even though Defendant comprehended the nature of the proceedings, he did not realize how serious things were. *Id.* at 9.

Later, at a hearing, Defendant and his brother attacked the doctor's conclusions, arguing they were competent and capable of representing themselves at trial. Defendant maintained the main reason for refusing appointed counsel was "because we feel that we have our own best interests at heart." He felt he was competent for the same reason and also took issue with the paranoid personality disorder diagnosis that was made, according to him, on the basis of his divine revelations:

> And this delusion system or the problems that he [Dr. Washburn] mentioned here, I don't understand these long words here, he relates that to the fact that we claim to have received direct revelation from God, which of course we do claim; but we have been taught since we were knee-high-to-a-grasshopper that that was what we were supposed to do in the church that we were in. So that shouldn't be such a shock to an individual, and especially when the individual is a member of that same church.

The Laffertys, acting as their own counsel, then proceeded to call and question various witnesses who knew or were acquainted with the Laffertys. Some testified the Laffertys were competent, while others expressed doubt. None of the witnesses were experts, except for Dr. Washburn who stood by his letter to the trial judge.

During the two day hearing the court painstakingly explained how foolish it was for the brothers to represent themselves.[8] During this time the court saw how the Laffertys behaved through its discussions with them and it further observed them deal with witnesses. In the end, the court ruled they were competent. It said if either of them suffered from mental illness, a preponderance, or clear preponderance of the evidence did not reveal they were so impaired they could not comprehend the nature of the proceedings or punishment they faced. *See, e.g.,* Utah Code Ann. § 77–15–2 (Repl.Vol.1990).

Defendant's next mental health exam came only a month later, and it followed his attack on a guard. The guard requested the exam because Defendant seemed "physically out of control and did not appear to be mentally in control of his facul-

7. Letter from C. Jess Groesbeck, M.D. to Judge J. Robert Bullock (Oct. 9, 1984) (hereinafter Oct. Groesbeck Letter); Letter from Philip Washburn, M.D. to Judge J. Robert Bullock (Oct. 10, 1984) (hereinafter Oct. Washburn Letter).

8. Defendant was ultimately represented at trial by counsel because at his final competency hearing he would not state for the record that he wished to represent himself.

ties" at the time of the attack. A team of doctors from Utah State Hospital, including one clinical and forensic psychologist and three physicians, examined Defendant for twenty-two days. Dr. Groesbeck, who examined Defendant in October and thought him incompetent then, was a member of the November team. This time, all four doctors, including Dr. Groesbeck, found Defendant competent.[9]

The November exam, which was much more thorough, disaffirmed October's results and concluded that Defendant was competent. During the exam, Defendant's "limited willingness to participate in formal psychological testing" was noted. Nov. Letter. Defendant's paranoid traits were also recognized, along with his "fundamentalist religious beliefs and a fervent interest in a strict interpretation of constitutional law." *Id.* Defendant was persuaded to take two psychological tests, including an I.Q. test and the Rorschach Inkblot test. The I.Q. test showed an above-average intellectual ability, while no evidence of formal thought disorder was suggested by the Rorschach. R. Howell, Ph.D., Psychological Assessment (Nov. 29, 1984) at 3. Some history compiled during the November exam revealed the possibility Defendant once suffered from a "bipolar affective disorder" but there were no signs or symptoms of it during the exam nor had there been for several years.[10] Nov. Letter. The court, on the basis of the reports, again found Defendant competent for trial.

The state of affairs shifted drastically when Defendant attempted suicide by hanging on Saturday, December 29th, 1984. This incident prompted another mental health examination as to his competency to stand trial was ordered. In the week before the suicide Defendant was agitated, having just had his trial date set. Apparently in response to the setting, he claimed to be possessed by an evil spirit and at-

tacked his brother at the jail. R. Verville, Psychiatric Evaluation (Jan. 21, 1985) at 2. As for his mental health immediately after the suicide attempt, the Utah State Hospital team concluded after twenty days of evaluation that Defendant was incompetent and exhibited numerous signs of diffuse organic brain damage.[11] Individual reports noted a range of problems. For example, Defendant had great trouble dressing and could not remember his age, the date or current events. On various psychological tests, which he willingly took, he scored in the brain damaged category. His I.Q. results were twenty points lower than the results from October 1984.

Although the mental health effects from the suicide attempt were initially severe, they eventually began to resolve. About a month after the attempt Defendant again knew he was charged with murder. He generally remembered what happened and told one doctor his personal problems were caused by others. He named Chloe Low as a person who intruded in "family affairs" and said "this wouldn't have happened if Chloe Low had minded her business." P. Heinbecker, M.D., Psychiatric Evaluation, (Jan. 21, 1985). This view of Chloe Low was, of course, consistent with statements previously made to Ms. Low by Defendant.

Later, at a competency hearing on January 28, 1985, Defendant knew the charges he faced and believed he could discuss events surrounding the homicides if he wished. He was, however, weak and had lingering memory problems. He could not, for instance, remember anything about the suicide attempt itself. On questioning from the judge, Defendant testified his memory was coming back everyday. Nevertheless, the judge concluded in the end that Defendant was not yet competent to stand trial, although his overall condition was improving, and suggested he soon

---

**9.** Letter from Drs. Austin, Howell, Heinbecker & Groesbeck to Judge J. Robert Bullock (Nov. 27, 1984) (hereinafter Nov. Letter).

**10.** A bipolar affective disorder is more commonly known as manic/depressive behavior. *See generally* American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disor-*

*ders* 213, 225 (3d ed. rev. 1987) (setting forth diagnostic criteria for mood disorders and bipolar disorders).

**11.** Letter from Drs. Heinbecker, Austin, Howell & Groesbeck to Judge J. Robert Bullock (Jan. 22, 1985) (hereinafter Jan. Letter).

would be competent. In his review of Judge Bullock's ruling at this point in the case, the Magistrate observed "Judge Bullock was obviously taking a concerned, conservative approach." The competency proceedings overall also convinced the Magistrate that the state had a "deep and intense consideration" of the Defendant's condition. After independently examining the record, we agree with both of these observations.

The final competency hearing on April 2, 1985, was literally a battle of the experts. On one side, doctors from Utah State Hospital concluded that Defendant's mental health had deteriorated into a religious delusional system containing strong elements of paranoia and an inability to "determine the boundaries between himself and good and evil spirits." [12] On the opposing side, a Prosecution expert testified Defendant was competent.

The state hospital doctors believed Defendant factually knew he was charged with murder and would be tried in a courtroom before a judge and jury. March Letter at 2. They did not, however, think he possessed a rational understanding of his situation. *Id.* And they attributed this lack of rationality to a personality change caused by oxygen deprivation to the brain during the attempted suicide. As a result, the doctors said Defendant's religious beliefs were now so delusional they "interfere[d] with his ability to meaningfully function, either independently in a courtroom or with the aid of counsel in a courtroom." They further noted defendant was again uncooperative when it came to taking psychological tests which could more specifically identify his mental state. Finally, signs of Defendant's lingering problems included one focal seizure involving his left hand and arm, and a doctor's note that Defendant was having trouble playing pool. Defendant seemed to forget which ball was the cue ball, and whether he was supposed to hit the striped or colored balls. R. How-

ell, Ph.D., Psychological Addendum (March 22, 1985). Their bottom line mental health diagnosis stated Defendant suffered from amnesia and paranoia. March letter at 2.

The Prosecution's doctor viewed the paranoid diagnosis as nothing but a "straw dog." For him, the existence of a paranoid delusional system was not relevant to whether Defendant "can assist counsel and understand the proceedings in this court, and understand the punishment." After framing the issue this way and studying Defendant's medical records for four hours,[13] he found Defendant competent. In support of his position he offered a generally functional view of rationality centering on whether a person can piece things together, see relationships between incidents, remember information, and thereby factually and theoretically assist in his defense. The Prosecution's doctor maintained a paranoid delusional system by itself does not mean incompetency to stand trial. *See* maj. op. at 1552–53.

After listening to both sides, the state trial court came down on the Prosecution's side and ruled Defendant competent to stand trial. *Utah v. Lafferty*, No. 9303, memorandum decision at 12 (Apr. 8, 1985). Specifically, the court found that even though Defendant suffered from mental illness, his condition was not so severe that it prevented him from comprehending the nature of the proceedings or the punishment he faced. *Id.* at 6. The court's findings in support of its position were detailed:

> [Defendant] has the mental capacity to appreciate his presence in relation to time, place and things; his elementary mental processes are such that he knows and understands that he is in a court of justice and is charged with criminal offenses of two counts of criminal homicide, two counts of aggravated burglary, and two counts of conspiracy to commit murder; he knows and understands the penalties prescribed and he knows and

---

12. Letter from Drs. Austin, Howell, Heinbecker & Groesbeck to Judge J. Robert Bullock (March 19, 1985) (hereinafter March Letter).

13. The question of whether the opinion of a psychiatrist was given after sufficient examination goes to the weight of the evidence and thus is a question for the trier of fact.

understands that he could be given the death penalty although he may not believe it will occur, he understands that there will be a trial, that there will be a judge on the bench, a prosecutor present who will try to convict him of criminal charges; knows and understands that he has a lawyer appointed for him who will undertake to defend him against those charges; he knows he will be expected, if he so chooses, to tell his lawyer the circumstances, to the best of his ability, of the facts surrounding him at the time and place where the law violations are alleged to have occurred; he knows that there will be a jury present to pass upon the evidence adduced as to his guilt or innocence of such charges; that he has sufficient mamory [sic] of material events that with the aid of memory reconstruction techniques he can relate these things in his own personal manner if he chooses to do so.

*Id.* at 6–7.

Turning to the paranoia diagnosis, the court conceded Defendant may be paranoid. But it was not persuaded the evidence—including the suicide attempt—meant Defendant was too paranoid or irrational for trial. The trial court wrote:

Although the defendant may be operating within a paranoid delusional system, there is no evidence, except a suicide attempt, of irrational behavior within that system or within the system of his religious beliefs. In fact, his refusal to cooperate, assist counsel or admit that he is amenable to the laws of the State of Utah are all consistent with his paranoia and any delusional system pertaining to religion.

*Id.* at 7.

This factual recount, as evidenced by the record, illustrates the basis upon which the trial court could and did fairly find Mr. Lafferty competent. Despite Mr. Lafferty's contention that his behavior at hearings after the suicide attempt demonstrates incompetence,[14] the record makes clear that Defendant's uncooperativeness was present both before and after the attempt. Therefore, his uncooperativeness cannot be attributed to any appreciable personality change appearing after the suicide attempt. The Defendant's own Utah State Hospital doctors admit in their final evaluation that "his personality structure and his demeanor have come to approximate his condition prior to [the] December 29[th]" suicide attempt. March Letter at 1.

The record is filled with instances where the Defendant was factually tuned in to the proceedings and rationally participating. The same trial judge observed Defendant in both the competency hearings and trial, and commented during the trial on Defendant's behavior. He noted, for example, that during the trial Defendant consulted with his attorney "quite frequently at the counsel table." His personal observations left him "more convinced now that I was ... that he's competent to proceed; or, to put it another way, that he's not incompetent to proceed." At the conclusion of the trial, the judge reaffirmed his views:

1. During a full and complete trial of the matter, from April 25, 1985 to May 7, 1985, a period of twelve days, which included approximately nine trial days, for the jury selection process, the trial and the penalty phase; the Court observed nothing in the words or conduct of the defendant, throughout the trial, which in any way showed or tended to show that he:

(a) [W]as unable to comprehend the nature of the proceedings;

(b) Was unable to understand the punishment specified for the offenses charged; or

(c) Was unable to assist counsel in his defense.

2. The Court wants to also make it clear that, as to the previous finding by the Court that the defendant was not incompetent to proceed, that should in no way be construed as merely a factual finding. Under any definition of the word "rational," which the Court in *Dusky v. Unites States* [sic] could have

---

14. At the final competency hearing, Mr. Lafferty was asked if he wanted to represent himself at trial. He responded to all inquiries by taking the Fifth Amendment and refusing to answer.

intended, this Court believes, from all of the evidence, including the Court's observation on nine trial days and also on numerous other times, at numerous other times prior to that trial, believes that the defendant's:

(a) Understanding of the proceedings, in his understanding of the punishment which could be imposed, that is the nature of the proceedings, the punishment that could be imposed; and his ability to consult with his lawyer, with a reasonable degree of rational understanding, are believed and held to be rational as well as factual understandings.

The Prosecuting attorney also noted how Defendant conversed with his lawyer. Moreover, at one point during the trial, Defendant's attorney reported to the court that Defendant:

indicated in direct answer to my inquiry that there is nothing that he wants presented that I am not going to present. And, secondly, that there is nothing that I have done now that he takes exception to or thinks it was inappropriate or was not done. In fact, he has been complementary [sic] until now, and complimentary a few minutes ago. So, as of this time I think that what I'm doing is in accordance with either his clear desire or certainly him agreeing that my judgment is probably best.

Lastly, the record shows Defendant assisted in his defense and, at one point, even ordered his attorney to stop pursuing testimony from his doctors. If admitted, Defendant's attorney could have used the testimony to argue Defendant was guilty of manslaughter, but not murder. Defendant, however, rejected this because he viewed this tactic as admitting guilt for a lesser charge. This action indicates Defendant obviously knew what was happening at trial, and it further shows his memory was clear because he recalled the specific information his attorney was pursuing from the doctors before he heard it again at trial.

## IV. CONCLUSION

The majority is unable to point to any evidence which shows Mr. Lafferty was not accurately perceiving reality as it related to the murder charges and courtroom proceedings. Rather, it relies solely upon the testimony at the last competency hearing and upon Mr. Lafferty's refusal to present an insanity defense as evidence of incompetence. From this fragment of the record, the majority concludes Mr. Lafferty was a person suffering from mental illness to such a degree that he was unable to make decisions on the basis of a realistic evaluation of his own best interests. Maj. op. at 1549, 1554, 1555. In reaching this conclusion, the majority substitutes its judgment of what is "realistic" and "best" for Mr. Lafferty. By taking issue with the subjective wisdom of Mr. Lafferty's decisions concerning how he wanted his case handled, the majority in effect chills constitutionally protected individual decision-making.[15]

We review the record only to ensure that a permissible decision was made in light of the evidence. We do not retry the case and we do not substitute our judgment for that of the state court. On the contrary, we must give the state court factual findings a presumption of correctness. "[W]e cannot reverse the District Court's ruling merely because the evidence arguably supports a different result and we might have ruled differently." *Bouchillon*, 907 F.2d at 594.

A trial, reduced to its essence, is the investigation and determination of one or

---

**15.** I doubt whether the court would be so quick to hold an individual incompetent to stand trial who refused to raise an insanity defense because of unorthodox political beliefs. For example, tax protesters and other political protesters are often in court expressing their extreme and inaccurate beliefs about the Constitution in bizarre ways. *See, e.g., Lonsdale v. United States,* 919 F.2d 1440 (10th Cir.1990). Although these individuals are wrong and may make decisions contrary to their best legal interest, they are not necessarily incompetent. Like Mr. Lafferty, they may possess a factual understanding of court proceedings and can, if they choose, consult with a lawyer with a reasonable degree of rational understanding. When one is judged incompetent for rejecting his attorney's advice we will then have truly established the elitism of the bench and bar.

more doubtful facts. In the case before us, the fact under inquiry is Mr. Lafferty's competence. The state trial court found Mr. Lafferty competent. The Utah Supreme Court found no error. The majority, under the guise of reviewing the legal standard applied by the Utah court, parsed the record and in effect made its own determination of competency believing the law permits only a review of the pretrial proceedings. When the evidence is evaluated under the correct standard there exists no doubt the state court's finding of competency is fully and fairly supported by the record.

Properly and carefully reviewing the record as a whole, and giving proper deference to the trial court's findings under the *Dusky* standard, I cannot in good faith conclude that the Utah court's competency determination is not fairly supported by the record. I would affirm Mr. Lafferty's conviction.