{¶ 73} I respectfully dissent with the majority opinion regarding Halder's first two assignments of error. First, it is my view that the trial court incorrectly determined Halder to be competent to stand trial. In addition, if Halder was competent to stand trial-as the trial court found and the majority affirmed — then he had a constitutional right to defend himself at that trial.
 {¶ 74} The majority thoroughly set forth the facts and procedural background of this case. In addition, the majority properly summarizes the law on competency to stand trial, as set forth in Dusky v. UnitedStates (1960), 362 U.S. 402, and the Ohio Revised Code. I further agree with the majority's standard of review an appellate court must abide by when reviewing a trial court's competency ruling.
 {¶ 75} Where I depart from the majority opinion, is that it is my view there was no competent, credible evidence to support the trial court's finding that Halder was competent to stand trial. Thus, as fully explained in the following analysis, I would conclude that the trial court abused its discretion when it found Halder to be competent.
 {¶ 76} In the case at bar, there is no dispute that if the test for competency only required that Halder understand the nature and objective of the proceedings against him, then he would be competent to stand trial. There is a divergence of opinion, however, with the second prong; i.e., whether he was capable of rationally understanding the proceedings against him, as well as rationally assisting with his defense. *Page 32 
 {¶ 77} Prior to reaching that question, however, we must determine whether Halder even had the requisite "mental condition" under R.C.2945.37. It is my view that Halder proved by a preponderance of the evidence that he did have the requisite "mental condition."
 MENTAL CONDITION {¶ 78} The trial court found Halder competent because it found Dr. Bergman to be more credible than the Dr. Eisenberg or Dr. Fabian. Although it is within the trial court's province to determine witness credibility, there must be some competent, credible evidence to base it on. State v. Hicks (1989), 43 Ohio St.3d 72, 79. It is clear that after reviewing Dr. Bergman's testimony in its totality, she improperly relied on the wrong legal standard when evaluating Halder's competency. As such, her opinion was not competent or credible.
 {¶ 79} Dr. Bergman testified that Halder had a severe personality disorder, but not a "major mental disorder or mental illness, per se." She stated that with a severe personality disorder, "[t]here wouldn't be any kind of symptoms that would prevent someone * * * from cooperating with their counsel." She explained that she was able to get Halder to cooperate with her by "just listening to what was very important to him," and nodding her head, and showing him that she was interested.
 {¶ 80} Dr. Bergman explained the distinction between a delusional disorder and a personality disorder by describing diagnoses on either Axis I or Axis II. She explained *Page 33 
that "mental illness" or "major mental disorders" are diagnosed on Axis I, such as psychotic disorders and mood disorders. Personality disorders and mental retardation are diagnosed on Axis II. She stated that "[personality disorders are not to considered to be mental illness. They are disorders that create aberrations of behavior and disturb an individual's adjustment in functioning but they are not mental illnesses. Mental illnesses are metabolic, neurological. They are diagnoses. They are progressive diseases. And personality disorders are developmental disorders." She further explained that a person with an Axis II disorder, such as a personality disorder, "doesn't meet the criteria under Ohio law of mental disease or defect of the mind, so * * * a personality disorder doesn't meet the first prong to be found incompetent."
 {¶ 81} On cross-examination, Dr. Bergman agreed that her "threshold issue in determining competence under the statute [was] whether or not the person has a mental illness or mental disorder." Defense counsel had Dr. Bergman read from R.C. 2945.371(G)(4), which provides: "If the evaluation was ordered to determine the defendant's mental condition at the time of the offense charged, the examiner's findings as to whether the defendant, at the time of the offense charged, did not know, as a result of a severe mental disease or defect, the wrongfulness of the defendant's acts charged."
 {¶ 82} Defense counsel then asked Dr. Bergman, "can you show us where it says in there that mental illness or mental defect is a prerequisite for a determination of *Page 34 
competency to stand trial?" (531) Dr. Bergman agreed that this subsection did not have anything to do with competency to stand trial, but addressed the issue of sanity.[39]
 {¶ 83} When further questioned by defense counsel, "where does it say mental disease or defect of the mind in regards to competency" is required, Dr. Bergman replied, "I'm not a lawyer. I can't tell you where in the statute it says that but I can tell you based on my training, my background and my experience for the past 29 years I know that in order to be incompetent to stand trial there has to be a mental disease or defect of the mind. A major mental disorder which prevents the person — makes them incapable of accomplishing to be competent. It can't just be that they are not cooperating or they don't like their attorneys or they don't agree with their attorneys. There is [sic] a lot of people who don't like their attorneys. * * *"
 {¶ 84} When pressed again by defense counsel to show the court where in the statute mental disease or defect was required for competency to stand trial, Dr. Bergman referred to R.C. 2945.37, which requires a mental condition. Defense counsel agreed that the statute required a mental condition, and then asked, "I assume that a severe personality disorder is a mental condition. Is it not?" Dr. Bergman replied, "It is not the type of mental condition that would prevent a person from being *Page 35 
able to do those things." Defense counsel again asked, "That is a mental condition. Is it not?" Dr. Bergman then conceded that a personality disorder is a mental condition. (536)
 {¶ 85} Dr. Bergman's "threshold issue" in determining competency, whether the person had a "mental disease or defect of the mind," was simply wrong. Specifically, she concluded that a person could not be found incompetent unless the person was first diagnosed with a "mental disease or defect of the mind." Because she diagnosed Halder as having a severe personality disorder, which she testified did not meet the "criteria under Ohio law of mental disease or defect of the mind," Halder could not be found incompetent under Ohio law. Ohio competency law, however, requires no such diagnosis.
 {¶ 86} Even after defense counsel was able to get Dr. Bergman to admit that her "threshold issue," used as the basis of her competency opinion, was actually the legal standard for determining sanity at the time theact was committed, Dr. Bergman steadfastly reiterated, "I know that in order to be incompetent to stand trial there has to be a mental disease or defect of the mind." Again, the statute for determining competency to stand trial clearly does not require a "mental disease or defect of the mind."
 {¶ 87} Thus, it is my view that Dr. Bergman's opinion was based upon the wrong legal standard, and therefore, was not competent or credible. Dr. Bergman testified *Page 36 
that a severe personality disorder is not a "mental disease or defect of the mind," but agreed it is a "mental condition," which is what the statute requires. Therefore, with Dr. Bergman's concession, it was undisputed that Halder had the requisite "mental condition," as all three experts then testified that he did.
 CAPABILITY TO RATIONALLY UNDERSTAND PROCEEDINGS AND ASSIST COUNSEL {¶ 88} R.C. 2945.37 mandates that the trial court "shall find the defendant incompetent" if "because of the defendant's present mental condition, the defendant is incapable * * * of assisting in the defendant's defense[.]" (Emphasis added.) Again, Dr. Bergman conceded that a severe personality disorder is indeed a "mental condition." As discussed in the following analysis, she also opined that Halder's severe personality disorder prevented him from "assisting] his attorneys in a rational manner." This is exactly what Dusky and the statute require to show someone is incompetent.
 {¶ 89} Throughout her testimony, Dr. Bergman refused to characterize Halder's behavior or thought processes as delusional. She did describe his behavior as "odd," "grandiose," "incredibly naive," "child-like," "bizarre," "paranoid," "not normal," "obsessed," and "extremely egocentric." She stated his statements were "outrageous," "inflammatory," "quite grandiose," "pretty off the wall," "pretty crazy," and "nonsensical." And she said his reasoning was "circular," "irrational," "illogical," *Page 37 
"just silly," "faulty," "magical," "inflexible," and "single-minded." Yet still, Dr. Bergman concluded, "I don't consider anything that Mr. Halder has said to be delusional."
 {¶ 90} It is apparent that when Dr. Bergman testified, she deliberately avoided saying the magical word "delusional." However, regardless of what Dr. Bergman labeled Halder's "mental condition," her testimony revealed that even she believed that his "mental condition" prevented him from "assisting] his attorneys in a rational manner" or rationally understand the proceedings.
 {¶ 91} Dusky "mandates the conclusion that the defendant lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him." Lafferty v. Cook (C.A.10, 1991), 949 F.2d 1546,1551, citing Dusky at 402. "[T]he relevant consideration is not the type of mental condition with which a particular defendant is afflicted, nor the way in which the condition manifests itself. Rather, the critical inquiry is whether the defendant's mental condition, however it may be labeled and whatever symptoms it may produce, prevents the defendant from having a rational or factual understanding of the proceedings against him or significantly prevents the defendant from consulting with his lawyer." Id. at fn. 3.
 {¶ 92} The United States Supreme Court has explained that theDusky standard meets the minimum due process requirements for determining competency. Godinez v. Moran (1993), 509 U.S. 389, 402
("[W]hile States are free to adopt competency *Page 38 
standards that are more elaborate than the Dusky formulation, the Due Process Clause does not impose these additional requirements"). After further review of Dr. Bergman's testimony, this author is not sure how she, or the trial court for that matter, could conclude that Halder was competent.
 {¶ 93} Significant to the analysis of whether Halder could "consult with his lawyer[s] with a reasonable degree of rational understanding," is Dr. Bergman's opinion "that everything that Mr. Halder says he believes." Keeping that statement in mind, a more extensive review of her testimony shows that Halder could not consult with his attorneys with any degree of rational understanding, let alone a reasonable one.
 {¶ 94} Dr. Bergman agreed that Halder believed that Case Western Reserve University's actions "set in motion a course of events that resulted in him being in court here today." She also agreed that Halder came back to his theory of the case, "this basic theme," every time she talked to him. Moreover, every time she talked to him, he told her "that if he were to present through his attorneys the entire story of what happened that he would be acquitted."
 {¶ 95} Dr. Bergman admitted that even after she confronted Halder and told him that "no jury or judge would acquit someone because someone aggravated them to the point that they lost control," that it "didn't deter him in the least from holding that *Page 39 
view."[40] She also stated, "the more he thinks about it and the more that he doesn't get acknowledged the bigger it gets for him."
 {¶ 96} She explained, "He believes that by putting all this in front of the jury they will be as compelled by how much he was harmed as he is, and they might even exonerate him. They might acquit him because they would agree how egregiously he was harmed." She agreed that was not a "logical conclusion from the facts."
 {¶ 97} Dr. Bergman said that Halder told her that "the judge is working with the Prosecutors." She acknowledged that Halder also believed his attorneys were "working for Case Western Reserve University" and stated, "[h]e believes that you're [his attorneys] not working in his best interest, that you're working with the Prosecutor." Halder told Dr. Bergman that his attorneys "only want to focus on the act of violence which is exactly what the Prosecutor wants to focus on." When asked if that sounded "delusional" to her, Dr. Bergman replied, "Well, in my opinion when Mr. Halder tells me that this is his proof, * * * no, that doesn't sound delusional to me, that's just silly. It's just silly. It's circular reasoning." *Page 40 
 {¶ 98} Despite Dr. Bergman's refusal to categorize Halder's reasoning as delusional, she admitted on cross-examination that when she wrote her evaluation report, she found that: "`Presently, Mr. Halder's ability to assist his attorneys in a rational manner is impaired by virtue of the characteristics of a severe personality disorder which interfere with his ability to consider alternative viewpoints and his ability to put his concerns into perspective in the context of the, "larger picture.'" She agreed that she concluded this because "when he sees a fact he cannot rationally make the proper conclusion or he cannot rationally assess that. * * * He cannot rationally assess what the facts * * * are * * * because he is obsessing on his defense and his theory." (643)
 {¶ 99} Dr. Bergman further acknowledged that she concluded in her report: "`Mr. Halder has thus far insisted on advancing a situation which amounts to an obsession for him as the primary defense strategy, while the attorneys have attempted, with scant success, to direct him to legal issues which are prudent and necessary to pursue, given the gravity of the legal situation and the associated jeopardy. Mr. Halder consistently angrily maligns his present attorneys, asserting that they are not representing him, but rather are working for the Prosecutor.'" She then testified that Halder believed his attorneys must be "working for the Prosecutor because they [have been] paid off by Case Western Reserve." *Page 41 
 {¶ 100} Thus, although Dr. Bergman would not agree that Halder had a mental illness, the foregoing testimony shows that she did opine that Halder's severe personality disorder (i.e., his mental condition) impaired his ability to rationally assist his counsel with his defense and rationally understand the proceedings.
 {¶ 101} The trial court, relying on Dr. Bergman, found that Halder had "a sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding." However, in its analysis, the trial court only referred to Halder being able to "consult with his attorneys about the facts of May 9, 2003." In its conclusion, the trial court stated:
 {¶ 102} "Defendant gave two of the expert witnesses detailed information about his involvement in the shooting on May 9, 2003. * * * If Dr. Bergman and Dr. Fabian were able to get answers to specific questions from the Defendant, then there is no reason that Defendant cannot consult with his attorneys about the facts of May 9, 2003." (Details omitted.)
 {¶ 103} The trial court further concluded: "Defendant's behavior also suggests that he is able to assist his attorneys in his defense. * * * Defendant has engaged in a pattern of refusing to answer questions about his past and his involvement in the May 9, 2003 shooting. An example * * * can be seen throughout his deposition taken by attorney Jennifer Schwartz in his civil case against Shawn Miller. At one point in the deposition, Defendant testified, `I don't talk to anyone unless I have *Page 42 
to.' * * * Defendant also refused to answer Ms. Schwartz's questions about why he received social security disability payments. This pattern of not answering questions continued when Defendant refused to answer the expert witness questions about where he purchased the gun and the helmet he used on May 9, 2003."
 {¶ 104} Although the trial court paid lip service to the requirement that Halder be capable of rationally assisting his counsel, it is clear that it based its decision solely on Halder's factual understanding of the events and proceedings. The trial court properly concluded that Halder could talk about the facts of May 9, 2003, about what happened, and that he clearly understood the nature and objectives of the proceedings against him. However, the trial court did not address whether Halder had a "rational, as well as factual, understanding," or whether he could "consult with attorney[s] with a reasonable degree of rational understanding."
 {¶ 105} Again, Dusky made clear that, "it is not enough for the [trial court] to find that `the defendant (is) oriented to time and place and (has) some recollection of events,' but that the `test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.'" (Emphasis added.)
 {¶ 106} In Godinez, supra, the United States Supreme Court outlined numerous rational decisions a defendant must be able to make under theDusky *Page 43 
standard, including whether to waive his privilege against compulsory self-incrimination; whether to waive his right to trial by jury; whether to waive his right to confront his accusers; and whether to put on a defense or raise an affirmative defense. Id. at 398-399.
 {¶ 107} There have also been several foreign cases which have delineated the Dusky standard regarding the "rational" requirement.[41]
 {¶ 108} In Lafferty, supra, an examiner found that Lafferty's "belief in a judicial conspiracy that included his lawyer did not detract from Lafferty's ability to aid in his defense, and that Lafferty's refusal to assist his attorney, while a product of his delusion, was a conscious choice." Id. at 1553. The district court agreed. Id. at 1554. The Tenth Circuit reversed the district court because "both [the examiner] and the court appear to have embraced the view that factual understanding alone is sufficient * * * [and] that is totally contrary to the circumstances inDusky." Id. at 1554-1555.
 {¶ 109} In New Hampshire v. Champagne (1985), 127 N.H. 266, 270-271, the New Hampshire Supreme Court explained the Dusky rational requirement: "[M]erely a factual understanding, whereby the defendant can recite, civics-class style, the cast of characters, their roles and the object of the proceedings, and can recall some events, is not enough. The defendant must also have a rational understanding *Page 44 
[and] also have the ability to communicate meaningfully with his lawyer so as to be able to make informed choices regarding trial strategy. This often involves decisions of constitutional moment * * *."
 {¶ 110} In United States v. Salley (N.D.Ill. 2003), 246 F.Supp.2d 970, the district court concluded Salley was not competent. Id. at 980. "In light of the consistency of Salley's belief that the defenders, the prosecutors, the FBI and the court are all against him * * *; the absence of any cooperation with counsel; the defendant's grandiose thinking with respect to his ability to represent himself and his prospects at trial, this court concludes that Salley is not competent to stand trial because, although he understands the nature and consequences of the proceeding, he lacks the capacity to cooperate with counsel. As a result, defendant lacks the competence to make rational choices about fundamental decisions * * *." Id. at 979-980.
 {¶ 111} A case strikingly similar to the case at hand, State v.Nagy (S.D.N.Y. 1998), Case No. 96 Cr. 601, 1998 U.S. Dist. LEXIS 9478, also cited by Halder, is worthy of discussion here. An examiner concluded the following about Nagy:
 {¶ 112} "Mr. Nagy is an intelligent individual who possesses a significant level of knowledge regarding legal proceedings. However, his judgment regarding how to pursue his self interest in these proceedings is grossly diminished by his paranoid concerns. Mr. Nagy's quest to obtain recognition and restitution for (likely) imagined *Page 45 
slights has precedence over his pursuing reasonable defense strategies. He perceives a trial as a stage upon which he can publicly decry the multiple injuries he believes have been inflicted upon him." Id. at 5.
 {¶ 113} The district court explained that, "`One can be intelligent * * * yet still have underlying psychiatric and emotional problems which cause incompetence. Simply having the capacity for rational understanding in the abstract is not sufficient if psychiatric or emotional problems prevent applying rational faculties to the problem.'" Id. at fn. 4, quoting James A. Cohen, The Attorney-Client Privilege, Ethical Rules, and the Impaired Criminal Defendant, U. Miami L. Rev. 529, 543 (1998)."
 {¶ 114} The district court then concluded that Nagy was not competent to stand trial, reasoning: "Nagy's paranoid delusions concerning a conspiracy against him and his grandiose notions regarding the function of a trial in this case * * * demonstrate that Nagy is not properly or rationally able to consider or assist in decisions with respect to his defense[.] * * * Nagy's desire to proceed to trial so that the conspiracy against him may be exposed is an example of his irrational thought process. * * * Nagy does not have a rational understanding of the proceedings against him when he believes that a criminal trial at which the media is present will serve to expose the conspiracy against him[.] * * * His understanding of the pending criminal proceedings is necessarily skewed by his belief that there is a conspiracy against him involving, *Page 46 
among others, judges, the Government, a priest, his landlord, and all psychiatrists who have examined him." Id. at 19-21.
 {¶ 115} Again, in the case at hand, Dr. Bergman testified "that everything that Mr. Halder says he believes." Halder consistently obsessed about his belief that he would be vindicated if only he could explain to the jury how Case Western Reserve University caused "a course of events" that led him to the violence. Even when confronted by Dr. Bergman that no judge or jury would acquit him for that, Halder remained steadfast in his view. Halder insisted that because his attorneys would not focus on his "basic theme," and all they wanted to focus on was "the act of violence," he believed that they had been paid by Case Western Reserve University and were working for the prosecutor.
 {¶ 116} Dr. Bergman refused to say that Halder's belief that his attorneys were working for Case Western Reserve University or the prosecutor was delusional, and instead, said it was "just silly" for Halder to believe that. Halder's conspiracy theory might be "silly" to Dr. Bergman, but to Halder, because of his mental condition (whether it was a severe personality disorder or delusional disorder), it was anything but silly. It was very real. Even Dr. Bergman testified that it was real to Halder. There was no suggestion that Halder was feigning his mental state or his belief in a "conspiracy theory." Dr. Bergman further admitted that Halder's "silly" and "circular" reasoning was irrational. *Page 47 
 {¶ 117} Nevertheless, Dr. Bergman still opined that if Halder could tell her about the events of May 9, 2003, then he could cooperate with his attorneys. The trial court concluded as much in its opinion ("All of this information demonstrates that Defendant can, in fact, assist his counsel.").
 {¶ 118} However, neither Dr. Bergman, nor the trial court addressed the "rational" element. The fact that Halder could talk about the "details" of May 9, 2003, and understood the nature of the proceedings against him, does not mean that he could rationally understand the proceedings or rationally assist in his defense. Rationally assisting with one's own defense presumes that one is able to make significant legal decisions about one's defense — with the advice counsel.
 {¶ 119} Under Dusky, it cannot reasonably be said that Halder could rationally understand the nature and proceedings against him if he genuinely believed that his attorneys, and the judge for that matter, were working for Case Western Reserve University and the prosecutor. Nor can it be reasonably said that Halder could rationally assist with his defense if he believed that by taking the stand and testifying to the jury about how Case Western Reserve harmed him, that the jury would understand how he had been egregiously harmed and exonerate him. Moreover, it cannot be said that Halder could rationally assist with his defense if he would not consider a plea that admitted any guilt, despite the strong case against him, even if it meant possibly saving *Page 48 
him from the death penalty. Halder insisted on presenting his conspiracy theory to the jury — and nothing could detract him from this.
 {¶ 120} The trial court also concluded that Halder's "behavior" suggests that he could assist his attorneys, but instead, Halder "engaged in a pattern of refusing to answer questions." As an example of Halder's "pattern" of refusing to answer questions, the trial court explained how Halder would not answer questions in his "deposition taken by attorney Jennifer Schwartz in his civil case against Shawn Miller."[42] It is my view that a deposition taken nearly three years prior to the competency hearing, especially in light of the fact that competency is a present condition, had no bearing on Halder's competency to stand trial.
 {¶ 121} Halder may have understood the nature and objectives of the proceedings against him, but in no way could he understand it rationally, nor could he rationally assist with his defense. Thus, I would conclude that the trial court's finding of competency cannot stand under the due process requirements set forth in Dusky and codified in R.C. 2945.37. Therefore, I would vacate Halder's conviction and sentence, and reverse and remand this case.
 SELF-REPRESENTATION *Page 49 {¶ 122} In addition, if Halder was competent to stand trial, then the trial court had a duty to inquire into Halder's request to represent himself at that trial in order to determine if his request was made knowingly, voluntarily, and intelligently. It is my view that the trial court did not properly inquire into Halder's request. If Halder did make his request knowingly, voluntarily, and intelligently, then he had a constitutional right to represent himself at trial.
 {¶ 123} This court has explained, "To invoke the right to self-representation, the right to the assistance of counsel must be knowingly, voluntarily and intelligently waived. A two-part inquiry may be required. First, the court must determine the defendant is competent to waive the right to counsel if the court has reason to doubt the defendant's competence. Second, the court must decide whether the waiver is knowing and voluntary. [Godinez, supra, at 400-402]." State v.Watson (1998), 132 Ohio App.3d 57, 63.
 {¶ 124} Once a defendant clearly and unequivocally informs a trial court that he wishes to represent himself, the court is obligated to determine whether the defendant knowingly, voluntarily, and intelligently waives his right to counsel. "The court's failure to inquire whether appellant knowingly, intelligently and voluntarily" waives his right to counsel violates the defendant's Sixth Amendment right to defend himself. Id. at 65. *Page 50 
 {¶ 125} Moreover, "[s]ince the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis. The right is either respected or denied; its deprivation cannot be harmless.' McKaskle [v. Wiggins (1984),465 U.S. 168,] at 178, n. 8." Watson at 66.
 {¶ 126} In order to make this determination, a trial court should candidly and thoroughly discuss with the defendant "the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." Id. at 64, quoting Von Moltkev. Gillies (1948), 332 U.S. 708, 723. "The defendant must fully understand the advantages that counsel can provide and the practical effect of giving up those advantages. The defendant also should be informed of the standards with which he will be expected to comply in conducting his own defense; for example, the Rules of Criminal Procedure and the Rules of Evidence. [State v. Gibson (1943), 45 Ohio St.2d 366,376-77]; State v. Overholt (1991), 77 Ohio App.3d 111." Watson at 64.
 {¶ 127} Whether a defendant has knowingly and voluntarily waived his right to counsel must be considered on a case-by-case basis. Id. InWatson, this court quoted the Ohio Supreme Court to serve as a guideline "for a common sense explanation of the factors relevant to the decision to waive the right to counsel: *Page 51 
 {¶ 128} `THE COURT: One other point that I am going to mention, and then you can do as you see fit. You cannot and will not be forced to have (counsel) participate in the case. I caution you, however, that if you attempt to defend yourself, you are bound by the same rules of evidence that bind a lawyer, and if you don't know those rules of evidence — and I presume you don't since you are not a lawyer to the best of my knowledge — when you attempt to question any witness to defend yourself, you may find that you are not able to ask any questions simply because you don't know the proper way to put the questions; and if a question is improperly asked, the court; that is, me, will stop you from asking the question. So, I am cautioning you that you may find you are in the position that you are unable to ask any questions, and you are unable to present a defense, because you do not know how. If you wish to take that risk, which could possibly prevent you from ever getting your story told, that's up to you. I cannot and will not function as your lawyer to lead you along. That's not my role, so I am telling you with caution you are facing a heavy charge, a first degree felony under Ohio law, which I am sure you are well aware carries a maximum penalty of 25 years; so, this is hardly a trifling matter. So, I personally would strongly urge you to permit experienced counsel to participate in your defense. If you do not wish to do so, you are over 21, I presume, and I have made it as plain to you as I am capable of making it what a dangerous course you are embarking on in my opinion. You are facing the heaviest charge in Ohio law with the exception of two or three charges such as a *Page 52 
murder, and to attempt to do so without an attorney to represent you in my opinion is a most dangerous course.'"
 {¶ 129} "Now, I am not saying that because you have an attorney you would be acquitted. I have no idea if the Prosecutor can prove the case he is going to attempt to prove or not. You are, of course, presumed innocent. It is simply my opinion that you have a much, much lesser chance to be adequately represented if you are representing yourself." Id. at 64-65, quoting Gibson, supra, at 372-373.
 {¶ 130} The majority adequately set forth the scant colloquy between Halder and the trial court, as well as the trial court's decision denying his request as untimely. The trial court did not discuss any of the relevant factors with Halder.
 {¶ 131} In its decision, the trial court relied upon State v.Vrabel, 99 Ohio St.3d 184 and United States v. Mackovich (C.A.10, 2000),209 F.3d 1227. After reviewing these cases, it is my view that they are distinguishable from the case at bar.
 {¶ 132} In Vrabel, the Supreme Court of Ohio, in upholding the trial court's decision denying Vrabel's "13th hour change of heart," reasoned, "appellant repeatedly changed his mind as to whether he wanted to represent himself or have counsel represent him prior to trial. The trial judge went to great lengths to accommodate appellant's continual changes of mind, and it is clear that the judge avoided acting hastily to ensure a correct and just decision." Id. at _52 (appellant had changed his mind at least six times from March 2005 to September 2005). *Page 53 
 {¶ 133} In Mackovich, the district court denied Mackovich's request to represent himself, concluding that it was an abuse of the judicial process and "merely a tactic for delay." Id. at 1237. The Tenth Circuit court upheld the trial court's denial for several reasons, including the fact that Mackovich had "coupled his request for self-representation made on the first day of trial with yet another `motion for continuance to prepare.'" Id.
 {¶ 134} In this case, I agree that Halder did not request to represent himself until the trial court denied his motion to disqualify his counsel, which was only five days before trial was to commence. Significant to this analysis, however, is the fact that there is absolutely no evidence that Halder made his request to proceed pro se in order to delay the trial. He did not simultaneously request a continuance or inform the trial court that he was not prepared to go to trial as scheduled. When the trial court denied the motion, Halder immediately and unequivocally moved to represent himself. When he did so, the trial court was obligated to engage in the required colloquy with him — in order to determine if he was knowingly, voluntarily, and intelligently waiving his right to assistance of counsel.
 {¶ 135} Had the trial court engaged Halder in the required colloquy, to determine if he was knowingly, intelligently, and voluntarily waiving his right to assistance of counsel, then the trial court could have determined if he possessed the requisite mental faculties to make such an important decision. In addition, when a trial *Page 54 
court advises a defendant of the dangers and disadvantages of self-representation, then the record will establish that he knows — or does not know — what he is doing and that his choice is made with eyes wide open. Godinez, supra, at fn. 12, citing Faretta v.California (1975), 422 U.S. 806, 835.
 {¶ 136} Thus, I would conclude that the trial court erred when it did not inquire into Halder's request to represent himself, and as such, violated his Sixth Amendment right. Therefore, if Halder was competent to stand trial as the trial court determined, then in my view, his conviction would have to be vacated and remanded for a new trial — because deprivation of the right of self-representation cannot be harmless.
[39] R.C. 2901.01(14) states that, "A person is `not guilty by reason of insanity' relative to a charge of an offense only if the person proves * * * that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts."
[40] After Dr. Bergman confronted Halder in February 2005, and weeks before his competency hearing, Halder wrote a letter to a professor at Case Western Reserve University. In it, he asked the professor to "contact some journalists" for him. He wanted to "tell the entire world the whole truth," and expose Case Western's "evil objectives," how it protected Shawn Miller after he "destroyed the information infrastructure," which Halder created, and ultimately caused the violence on May 9, 2003. Halder also claimed his attorneys and judge were working for the prosecutor.
[41] The Ohio Supreme Court adopted the Dusky standard (State v.Berry (1995), 72 Ohio St.3d 354, 359), but it has never expanded on the rational element of the test. Thus, although these cases are not controlling, they are instructive.
[42] Halder filed his civil case against Shawn Miller in June of 2001. The trial court granted summary judgment to Miller in September 2002. Halder appealed, and this court dismissed the appeal on April 29, 2003. *Page 1